# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

08 CIV 7389

| | |
|---|---|
| LOUISIANA MUNICIPAL POLICE EMPLOYEES RETIREMENT SYSTEM, Derivatively and on Behalf of CITIGROUP, INC., <br><br> Plaintiff, <br><br> vs. <br><br> VIKRAM PANDIT, C. MICHAEL ARMSTRONG, ALAIN J.P. BELDA, WINFRIED BISCHOFF, KENNETH T. DERR, JOHN M. DEUTCH, ROBERTO HERNANDEZ RAMIREZ, ANDREW N. LIVERIS, ANNE MULCAHY, RICHARD D. PARSONS, LAWRENCE RICCIARDI, JUDITH RODIN, ROBERT E. RUBIN, ROBERT L. RYAN, FRANKLIN A. THOMAS, CHARLES PRINCE, GARY CRITTENDEN, HAMID BIGLARI, RAYMOND MCGUIRE, CINDY ARMINE, STEPHEN VOLK, JOHN HAVENS, BONNIE HOWARD, LEWIS B. KADEN, BRIAN LEACH, RICHARD C.S. EVANS, JAMES A. FORESE, and JOHN GERSPACH, <br><br> Defendants, <br><br> and <br><br> CITIGROUP INC., <br><br> Nominal Defendant. | Case No. _____ <br><br><br> VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, GROSS MISMANAGEMENT, AND VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934 <br><br> **Jury Trial Demanded** <br><br> RECEIVED <br> AUG 2 0 2008 <br> U.S.D.C. S.D. N.Y. <br> CASHIERS |

Plaintiff, by its undersigned attorneys, submits this Shareholder Derivative Complaint ("Complaint") against each of the individual defendants ("Defendants") named herein and, nominally, against Citigroup Inc. ("Citi" or the "Company").

**NATURE OF THE ACTION**

1.        Citi is one of the leading providers of financial services in the world, with tens of millions of customer accounts.  As such, the Company depends for its success on the identity of its brand – and its reputation for honesty and integrity.

2.        Today – through the misconduct of certain officers and directors named as defendants herein – Citi's reputation lies in tatters.  Defendants consciously steered the Company down a path of deceit and manipulation in the market for so-called auction rate securities ("ARS") that will take years to recover from and cost Citi *tens of billions of dollars* in settlements, fines, and lost business.  The Company has been the target of an administrative proceeding by the Securities and Exchange Commission ("SEC") relating to ARS, and the New York Office of Attorney General and other state securities agencies have commenced investigations.  To head off the investigations, Defendants recently agreed to a settlement requiring the Company to pay a fine of **$100 million**, repurchase **$7.3 billion** of ARS from customers, and keep ARS inventories worth **$15 billion** on its books that are essentially worthless.

3.        Plaintiff Louisiana Municipal Police Employees Retirement System (the "Retirement System" or "Plaintiff") is a large institutional shareholder of Citi.  The Retirement System is bringing this action on behalf of the Company against the directors and officers who are responsible for the auction rate securities debacle.  The action is based on defendants' wrongful conduct during the period from July 1, 2007 to the present (the "Relevant Period").

**Auction Rate Securities**

4.        The action concerns auction rate securities ("ARS") marketed by Citi to its customers between July 20, 2007 and the present (the "Relevant Period").  ARS are municipal bonds, corporate

bonds, and preferred stocks with no fixed rates of return, but whose rates of return are periodically re-set – typically every 7, 14, 28, or 35 days, but in some cases even daily – by an auction process. ARS are usually issued with maturities of 30 years, but the maturities can range from five years to perpetuity. First developed in 1984, as of today's date, the market for ARS has grown to well over $300 billion annually.

5.    ARS represented a large and lucrative portion of Citi's fixed income division, and the Company's overall profits depended substantially on its ability to sell such securities to its corporate and institutional customers.

6.    The success of the ARS market at Citi – on which Defendants' reputation and bonuses was based – depended on the perception that the market was extremely liquid. This is because the primary target customers for ARS are investors with short-term investment goals or cash-equivalent needs. Any hint that the ARS market was not liquid had the potential to trigger a massive sell-off by investors flocking to safer, more stable securities. Thus, a failed auction, or even the rumor of one, was a something that Defendants sought to avoid at all cost, even if it meant steering the Company into an illegal course of action.

**Defendants' Illegal Course of Conduct**

7.    That is precisely what Defendants did. Although the market for ARS had become illiquid by mid-2007, Defendants – to protect the profits Citi made on ARS and to enhance their own positions and compensation – conspired to create the illusion that the market remained liquid. Thus, Defendants caused Citi to engage in various practices designed to "support" the market, which they termed market "stabilization." In reality, however, the conduct was nothing short of the type of market manipulation scheme that the securities laws have, for generations, proscribed.

8.    For example, Defendants caused Citi to: (a) take over its own customers' bid orders by filling in the blanks on open or market orders *after viewing other bidders' orders*; (b) bid for its own accounts without disclosing this fact to customers; (c) engage in a process of "netting" of customers' buy and sell orders so as to favor certain customers at the expense of others; (d) allow for rampant submission or revision of bids *after* the expiration of deadlines set by the ARS market; (e) collaborate with certain customers by asking them to bid at auctions and then compensating them in the secondary market with rates that were higher than the official clearing rate set at auction; (f) give inconsistent and contradictory indications to customers regarding the likely range at which particular auctions would clear.

9.    Despite Defendants' attempt to artificially prop up the ARS market at Citi, the inherent illiquidity in the market soon overwhelmed Defendants' efforts.  By August 2007, more auctions were failing than succeeding.  Beginning at that point, Defendants decided to sell as many of the Company's ARS as they could onto unsuspecting customers – and thereafter to simply "walk away" from the ARS market.

10.    By February 2008, Defendants' goal was accomplished.  Thousands of investors, holding millions of dollars of ARS purchased from Citi, were now left with highly illiquid, and essentially worthless, investments.

11.    Defendants' efforts to conceal their market manipulation scheme were to no avail.  After causing Citi to "walk away" from the ARS market, the Company became the target of investigations by the Securities and Exchange Commission ("SEC"), New York Attorney General, and other state agencies.  On August 1, 2008, New York Attorney General Andrew Cuomo announced his intent to file charges.

12.     Citi settled the investigations promptly, agreeing to an onerous settlement with the regulatory agencies that, among other things, required the Company to pay a fine of **$100 million**, to repurchase **$7.3 billion** of ARS from customers, and to keep ARS inventories on its books in the par amount of over **$15 billion** that are essentially worthless.

13.     Defendants' actions have caused untold harm to Citi.  The Company is exposed to tens of billions of dollars in losses, settlements, damages, and other liability that it would not otherwise have been exposed to.  In addition, the Company faces irremediable damages to its reputation from formal investigations by various state and federal agencies.

14.     Defendants' acts and omissions constituted material breaches of their fiduciary duties Citi.  Throughout the Relevant Period, Defendants breached their fiduciary duties to shareholders and the Company, in the following ways, among others:

(a)     Deceptively marketing ARS to customers as highly liquid cash alternatives when, in fact, the ARS market was anything but liquid;

(b)     Failing to disclose that the ARS market was only "liquid" to the extent that Defendants and other broker-dealers had created an artificial market for ARS;

(c)     Failing to disclose that they caused Citi to purchase ARS for its own account to avert auction failures and that, but for these and other interventions, a great deal of these auctions would have failed;

(d)     Manipulating the market for ARS by various methods and thereby exposing the Company to criminal and civil investigations and liability, as well as the obligation to repurchase ARS and maintain large inventories of ARS that are essentially worthless;

(e) Failing to implement or maintain adequate internal controls to ensure that the Company's transactions in ARS were legal, honest, and fair to customers;

(f) Making false and misleading statements to the Company's shareholders regarding the supposed liquidity of the ARS market, the integrity of the profits made by the Company from this market, and the Company's exposure to losses from ARS;

(g) Paying themselves lavish salaries, bonuses, stock awards, and other compensation at a time when they had caused Citi to face exposure in the tens of billions of dollars for their wrongdoing; and

(h) unjustly enriching themselves at the expense of the Company through their sale of stock based on material, non-public information.

15. To remedy this flagrant wrongdoing, the Retirement System seeks relief in the name of the Company that, among other things, requires Defendants to pay damages to the Company to compensate it for its losses at their behest, requires Defendants to make restitution to the Company of the monies they caused it to transfer to them, and requires the Company itself to institute appropriate reforms to strengthen the Board's supervision of operations and strengthen the internal audit and control functions.

## JURISDICTION AND VENUE

16. This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331, because of claims presenting federal questions arising under the Exchange Act, and pursuant to 28 U.S.C. § 1367(a) because all others claims are so related to claims presenting federal questions that they form part of the same case or controversy. This Court also has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. § 1332 in that, upon information and belief, complete diversity

exists between the Retirement System and each of the Defendants and the amount in controversy exceeds $75,000.

17.    The Court has personal jurisdiction over each of the Defendants because each either is a corporation that conducts business in and maintains operations in this District or is an individual with sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

18.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because:  (a) Citi maintains its principal place of business here; (b) one or more of the Defendants either resides in or maintains executive offices here; (c) a substantial portion of the transactions and wrongs complained of herein occurred here; and (d) Defendants have received substantial compensation and other transfers of money here by doing business here and engaging in activities having an effect here.

## THE PARTIES

### Plaintiff

19.    Plaintiff Retirement System is, and was during the Relevant Period, an owner and holder of the common stock of Citi.  The Retirement System is an instrumentality of the State of Louisiana and a resident thereof.

### Nominal Defendant

20.    Nominal defendant Citi is a leading global financial services company with approximately 200 million customer accounts and operations in more than 100 countries.  The Company is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 399 Park Avenue, New York City, New York.

**Individual Defendants**

21.     Defendant Vikram Pandit ("Pandit") has been the Chief Executive Officer of Citi since December 2007 and a member of the Board of Directors of Citi (the "Board") since 2007. He was Chairman and Chief Executive Officer of the Company's Institutional Clients Group from October 2007 to December 2007, and Chairman and Chief Executive Officer of Citi Alternative Investments from April 2007 to October 2007. In exchange for his purported trust, loyalty, and fidelity to Citi, Pandit in 2007 was paid over $573,000 in salaries, bonuses, fees, stock options, stock awards and other compensation. In addition, the Company paid him $165 million in connection with the purchase of Pandit's former partnership interests in Old Lane Partners, L.P. Upon information and belief, Pandit is a resident of New York.

22.     Defendant C. Michael Armstrong has been a member of the Board since 1989. He is a member of the Executive Committee, the Personnel and Compensation Committee, and the Nomination and Corporate Governance Committee of the Board. In exchange for his purported trust, loyalty, and fidelity to Citi, Armstrong in 2007 was paid over $242,000 in fees, stock awards and other compensation. Upon information and belief, Armstrong is a resident of Florida.

23.     Defendant Alain J.P. Belda ("Belda") has been a member of the Board since 1997. He is a member of the Executive Committee and the Nomination and Corporate Governance Committee of the Board, and Chair of the Board's Personnel and Compensation Committee. In exchange for his purported trust, loyalty, and fidelity to Citi, Belda in 2007 was paid over $170,000 in fees, stock awards and other compensation. Upon information and belief, Belda is a resident of Pennsylvania.

24.     Defendant Winfried Bischoff ("Bischoff") has been Chairman of the Board of Citi since December 2007.  He has held and continues to hold a number of high-level executive positions at the Company and was Chairman of the Board from 1983 to 1994.  He is a member of the Executive Committee of the Board.  In exchange for his purported trust, loyalty, and fidelity to Citi, Bischoff in 2007 was paid over $6,130,000 in salaries, bonuses, fees, stock options, stock awards and other compensation.  Since July 20, 2007, based upon his knowledge of material, non-public information about the Company, Bischoff has sold over 11,975 shares of Citi stock for $289,795. Upon information and belief, Bischoff is a citizen of the United Kingdom.

25.     Defendant Kenneth T. Derr ("Derr") has been a member of the Board since 1987.  He is a member of the Personnel and Compensation Committee and the Nomination and Corporate Governance Committee of the Board.  In exchange for his purported trust, loyalty, and fidelity to Citi, Derr in 2007 was paid over $241,000 in fees, stock awards and other compensation.  Upon information and belief, Derr is a resident of California.

26.     Defendant John M. Deutch ("Deutch") has been a member of the Board since of Citi since 1996.  He is the Chair of the Audit and Risk Management Committee, and a member of the Executive Committee and the Nomination and Governance Committees.  In exchange for his purported trust, loyalty, and fidelity to Citi, Deutch in 2007 was paid $260,000 in fees, stock awards and other compensation.   Upon information and belief, Deutch is a resident of Massachusetts.

27.     Defendant Roberto Hernandez Ramirez ("Hernandez") has been a member of the Board since 2001.  He is a member of the Public Affairs Committee of the Board.  In exchange for his purported trust, loyalty, and fidelity to Citi, Hernandez in 2007 was paid $2,610,000 in fees,

stock awards and other compensation.  Upon information and belief, Hernandez is a citizen of Mexico.

28.     Defendant Andrew N. Liveris ("Liveris") has been a member of the Board since 2004.  He is a member of the Audit and Risk Management Committee of the Board.  In exchange for his purported trust, loyalty, and fidelity to Citi, Liveris in 2007 was paid over $163,000 in fees, stock awards and other compensation.  Upon information and belief, Liveris is a resident of Michigan.

29.     Defendant Anne Mulcahy ("Mulcahy") has been a member of the Board since 2004. She is a member of the Audit and Risk Management Committee of the Board.  In exchange for her purported trust, loyalty, and fidelity to Citi, Mulcahy in 2007 was paid $240,000 in fees, stock awards, and other compensation.  Upon information and belief, Mulcahy is a resident of Connecticut.

30.     Defendant Richard D. Parsons ("Parsons") has been a member of the Board since 1996.  He is a member of the Executive Committee and the Personnel and Compensation Committee, and Chariman of the Nomination and Governance Committee, of the Board.  In exchange for his purported trust, loyalty, and fidelity to Citi, Parsons in 2007 was paid over $200,000 in fees, stock awards, and other compensation.  Upon information and belief, Parsons is a resident of New York.

31.     Defendant Lawrence Ricciardi ("Ricciardi") has been a member of the Board since July 21, 2008.  He is a member of the Audit and Risk Management Committee of the Board.  Upon information and belief, Ricciardi is a resident of New York.

32.     Defendant Judith Rodin ("Rodin") has been a member of the Board since 2004.  She is a member of the Audit and Risk Management Committee and the Executive Committee, and Char

of the Public Affairs Committee.  In exchange for her purported trust, loyalty, and fidelity to Citi, Rodin in 2007 received over $170,000 in fees, stock awards, and other compensation.  Upon information and belief, Rodin is a resident of Pennsylvania.

33.    Defendant Robert E. Rubin ("Rubin") has been a member of the Board since 1999. He is Chairman of the Executive Committee.    Since July 20, 2007, based upon his knowledge of material, non-public information about the Company, Rubin has sold over 9,010 share of Citi stock for $218,042.  Upon information and belief, Rubin is a resident of New York.

34.    Defendant Robert L. Ryan ("Ryan") has been a member of the Board since 2007.  He is a member of the Audit and Risk Management Committee and the Public Affairs Committee of the Board.  In exchange for his purported trust, loyalty, and fidelity to Citi, Ryan in 2007 received over $43,000 in fees, stock awards, and other compensation.  Upon information and belief, Ryan is a resident of  New York.

35.    Defendant Franklin A. Thomas ("Thomas") has been a member of the Board since 1970.  He is a member of the Public Affairs Committee.  In exchange for his purported trust, loyalty, and fidelity to Citi, Thomas in 2007 received over $231,000 in fees, stock awards, and other compensation.  Upon information and belief, Thomas is a resident of New York.

36.    Defendant Charles Prince ("Prince") was the Chief Executive Officer of Citi until October 2007, when he was terminated.  In exchange for his purported trust, loyalty, and fidelity to Citi, Prince in 2007 received over $15,105,000 in salaries, bonuses, fees, stock options, stock awards and other compensation.  Upon information and belief, Prince is a resident of New York.

37.    Defendant Gary Crittenden ("Crittenden") is the Chief Financial Officer of Citi.  In exchange for his purported trust, loyalty, and fidelity to Citi, Crittenden in 2007 was paid over

$19,300,000 in salaries, bonuses, fees, stock options, stock awards and other compensation. Since July 20, 2007, based upon his knowledge of material, non-public information about the Company, Crittenden has sold over 66,341 shares of Citi stock for $1,452,867. Upon information and belief, Crittenden is a resident of New York.

38.    Defendant Hamid Biglari ("Biglari") is the Chief Operating Officer, Institutional Clients Group, of Citi, and is a member of the Senior Leadership Committee of the Company. Upon information and belief, Biglari is a resident of New Jersey.

39.    Defendant Raymond McGuire ("McGuire") is the Co-Head, Global Investment Banking, Institutional Clients Group, of Citi, and is a member of the Senior Leadership Committee of the Company. Upon information and belief, McGuire is a resident of New York.

40.    Defendant Cindy Armine ("Armine") is the Chief Compliance Officer of Citi, and is a member of the Senior Leadership Committee of the Company. Upon information and belief, Armine is a resident of New York.

41.    Defendant Stephen Volk ("Volk") is the Vice Chairman of Citi, and is a member of the Senior Leadership Committee of the Company. In exchange for his purported trust, loyalty, and fidelity to Citi, Volk in 2007 received over $7,597,000 in salaries, bonuses, fees, stock options, stock awards and other compensation. Since July 20, 2007, based upon his knowledge of material, non-public information about the Company, Volk has sold over 22,477 shares of Citi stock for $543,943. Upon information and belief, Volk is a resident of New York.

42.    Defendant John Havens ("Havens") is the Chief Executive Officer, Institutional Clients Group, of Citi, and is a member of the Senior Leadership Committee of the Company. Upon information and belief, Havens is a resident of New York.

43.     Defendant Bonnie Howard ("Howard") is the Chief Auditor of Citi, and is a member of the Senior Leadership Committee of the Company.  Upon information and belief, Howard is a resident of New York.

44.     Defendant Lewis B. Kaden ("Kaden") is the Vice Chairman of Citi, and is a member of the Senior Leadership Committee of the Company.  In exchange for his purported trust, loyalty, and fidelity to Citi, Kaden in 2007 received over $6,771,000 in salaries, bonuses, fees, stock options, stock awards and other compensation.  Since July 20, 2007, based upon his knowledge of material, non-public information about the Company, Kaden has sold over 14,728 shares of Citi stock for $356,417.  Upon information and belief, Kaden is a resident of New York.

45.     Defendant Brian Leach ("Leach") is the Chief Risk Officer of Citi, and is a member of the Senior Leadership Committee of the Company.  Upon information and belief, Leach is a resident of Connecticut.

46.     Defendant Richard C.S. Evans ("Evans") is the Chief Risk Officer, Institutional Clients Group, of Citi, and is a member of the Senior Leadership Committee of the Company.  Upon information and belief, Evans is a citizen of the United Kingdom.

47.     Defendant James A. Forese ("Forese") is the Head, Global Capital Markets, Markets and Banking, Institutional Client Group, of Citi, and is a member of the Senior Leadership Committee of the Company.  Since July 20, 2007, based upon his knowledge of material, non-public information about the Company, Forese has sold over 100,000 shares of Citi stock for $2,579,000.  Upon information and belief, Forese is a resident of New York.

48.     Defendant John Gerspach ("Gerspach") is the Controller and Chief Accounting Officer of Citi, and is a member of the Senior Leadership Committee of the Company.  Since July

49.     The Defendants who served on Citi's Board during the events complained of named in paragraphs 21-35 hereof are referred to as the "Director Defendants."  The Defendants who served as officers of the Company during the events complained of named in paragraphs 21, 24 and 36-48 are referred to as the "Officer Defendants."  (There is some overlap between these two groups of Defendants.)

## DERIVATIVE ALLEGATIONS

50.     Plaintiffs bring this action derivatively in the right and for the benefit of Citi to redress injuries suffered, and to be suffered, by Citi as a direct result of the breaches of federal and state law, fiduciary duty, abuse of control, and gross mismanagement,  as well as the aiding and abetting thereof, by the Defendants.  Citi is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

51.     Plaintiffs will adequately and fairly represent the interests of Citi in enforcing and prosecuting its rights.

52.     Plaintiffs are and were owners of the stock of Citi during times relevant to the Defendants' wrongful course of conduct alleged herein, and remain shareholders of the Company.

53.     Prosecution of this action, independent of the current Board of Directors, is in the best interests of the Company.

## DEMAND FUTILE AND EXCUSED

54.      Demand upon the Board of Citi that they institute this action in the company's name would be entirely futile, and is therefore excused.

55.      The Board of Citi consists of fifteen (15) individuals:  Defendants Pandit, Armstrong, Belda, Bischoff, Derr, Deutch, Hernandez, Liveris, Mulcahy, Parsons, Ricciardi, Rodin, Rubin, Ryan, and Thomas.  A majority of these individuals are not disinterested and independent with respect to the acts and omissions alleged herein, and each faces a substantial likelihood of personal liability:

(a)      **Pandit** and **Bischoff** are high-level, highly-compensated executive officers of Citi, and the Company has conceded that they are not independent under either the listing standards of the New York Stock Exchange or the Company's own Director Independence Standards.  Similarly, **Hernandez**, though not an officer, holds 14.6 million shares of Citi and received nearly $3 million in bonuses in 2007.

(b)      **Deutch**, **Liveris**, **Mulcahy**, **Ricciardi**, **Rodin**, and **Rubin** sit on the Audit and Risk Oversight Committee, which allowed Citi to defraud its own customers, manipulate the market for ARS, carry the ARS on the Company's books at an artificially inflated price, and expose the Company to tens of billions of dollars in damages.

(c)      Defendants, on behalf of Citi, conceded in the Company's 2008 Proxy Statement that **Bischoff**, **Hernandez**, **Pandit**, and **Rubin** are not independent.

(d)      **Derr** and **Thomas** have sat on the board for a combined **57 years** (20 years and 37 years each, respectively).  They have served so long that they clearly identify

exclusively with the Board and their fellow officers and cannot be expected to be independent and disinterested with respect to the consideration of demand.

(e)     **Belda**, **Armstrong**, **Thomas**, **Mulcahy**, and **Rodin** were the beneficiaries of the full Board's decision to accelerate the vesting of stock options held by these defendants in order to avoid recognizing the related expense.

(f)     The **other directors** are dominated and controlled by Bischoff, the Chairman of the Board, who has spent a quarter of a century in high-level executive positions at Citi, heads the Company's European operations, and controls the compensation and other benefits paid to the other directors, what committees they sit on, what role they will play in governance, and other processes.

(g)     Based on their knowledge of material, non-public information, **Bischoff, Rubin, Crittenden, Volk, Kaden, Forese, and Gerspach** (the "Insider Selling Defendants"), while in possession of material, non-public information regarding the Company's exposure to losses, settlements, and liability in the ARS market, sold almost **$5,440,064 million** in Citi stock since July 20, 2007; these directors cannot be expected to objectively consider a demand that the Board take action against the Insider Selling Defendants and the other Defendants.

(h)     Certain directors play disproportionately large roles in the governance of Citi, either because they sit on a majority of the committees of the Board or because they sit on more than one committee of which they chair at least one:  **Armstrong** (a majority of committees); **Belda** (a majority of committees, plus chairing one committee); **Deutch** (a majority of committees, plus chairing one committee); **Parsons** (a majority of committees,

plus chairing one committee); and **Rodin** (a majority of committees, plus chairing one committee).

(i)     **Pandit** received $165 million from Citi upon the sale of his partnership interest in Old Lane Partners, L.P. in 2007.

56.     In addition, while Citi and its public shareholders have suffered substantial damage and losses due to the deceit and deception committed by its insiders and the director oversight failings committed by its Board, the insiders and directors of this Company have not only suffered no damages but, in fact, have greatly profited from their participation in the illegal conduct. These individuals have usurped tens of millions of dollars of regular and bonus compensation, as well as severance payments, stock grants and stock awards as a result of their incompetent performance and deceptive activities.

57.     As a result of their concealments and falsifications, many of the directors and managers of Citi held onto their positions of power, prestige and profit at the Company.  Several – such as defendant Prince – were awarded with bonuses and severance packages in multiple tens of millions of dollars.

135.     The Citi Board is still dominated and controlled by wrongdoers who continue to obscure their own misconduct, and will not take action to protect the interests of Citi or its shareholders.  The present Board of Directors of Citi has refused, and will continue to refuse, to institute this action for the foregoing and following reasons:

(a)     The acts complained of herein constitute violations of fiduciary duties owed by the Board of Directors and these acts are incapable of ratification;

(b)    Certain of the known principal wrongdoers and beneficiaries of the wrongdoing complained of herein are in a position to, and do, dominate and control the Board of Directors.  Thus, the Board could not exercise independent objective judgment in deciding whether to bring or vigorously prosecute this action;

(c)    The acts complained of herein are illegal and improper and thus are acts incapable of ratification;

(d)    In order to bring this action for breach of fiduciary duty, abuse of control and fraud, the members of the Board of Directors would have been required to sue themselves and/or their fellow directors and allies in the top ranks of the Company, who are their good friends and with whom they have entangling financial alliances, interests, and dependencies, which they would not do.  They therefore would not be able to vigorously prosecute any such action;

(e)    The members of the Citi Board, including each of the defendants herein, receive substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board and their control of Citi.  They have thus benefited from the wrongs herein alleged and have engaged therein to preserve their positions of control and the perquisites thereof, and are incapable of exercising independent objective judgment in deciding whether to bring this action.  The Board members also have close personal or business ties with each other and are, consequently, interested parties and cannot in good faith exercise independent business judgment to determine whether to bring this action against themselves; and

(f)    The Citi directors' and officers' liability insurance policies for the relevant period have an "insured vs. insured" exclusion. Thus, if the directors caused the Company to sue its officers and directors for the liability asserted in this case they would not be insured for that liability. They will not do this to themselves or the officers they hired. The directors' and officers' liability insurance was purchased and paid for with corporate funds to protect the Company. This derivative suit does not trigger the "insured vs. insured" exclusion, and thus only this derivative suit can obtain a recovery on the directors' and officers' liability insurance and benefit the Company.

137.    In addition to the foregoing, the present Board of Directors of Citi have refused, and will continue to refuse to institute this action because they face debilitating conflicts of interest as a result of their direct complicity in the actions complained of herein, the benefits that they received therefrom, and also as a result of their membership on committees of the Board directly responsible for oversight of the Company.  In addition, demand on the Board of Directors of Citi must also be excused for the following reasons, among others:

(a)    Defendant **Bischoff** will take no action against the remainder of the Citi Board, and they will take no action against him, because defendant Bischoff is the Chairman of the Board of Directors and is the Chairman of Citi Europe, and defendant Bischoff has dominated and now continues to dominate and control the Company as a result of his joint roles as the senior most executive officer and leading Board member of the Company;

(b)    Defendants will also take no action against one another or against any member of the Board because each member of the Board received hundreds of thousands of

dollars per year in compensation in exchange for their purported trust, loyalty and fidelity and as compensation for serving as a member of the Board and as member of the committees thereof. Accordingly, defendants will take no action against themselves or the other members of the Board of Directors of Citi, because doing so would place compensation in jeopardy at least as follows: (i) over $165 million in salaries, bonuses, fees, stock awards and other compensation paid to defendant **Pandit** during 2007; (ii) $242,000 in fees, stock awards and other compensation paid to defendant **Armstrong** during 2007; (iii) over $170,000 in fees, stock awads and other compensation paid to defendant **Belda** during 2007; (iv) over $6,130,000 in salaries, bonuses, fees, stock awards and other compensation paid to defendant **Bischoff** during 2007; $241,000 in fees, stock awards and other compensation paid to defendant **Derr** during 2007; $260,000 in fees, stock awards and other compensation paid to defendant **Deutch** during 2007; over $2,610,000 in fees, stock awards and other compensation paid to defendant **Hernandez** during 2007; $163,000 in fees, stock awards and other compensation paid to defendant **Liveris** during 2007; $240,000 in fees, stock awards and other compensation paid to defendant **Mulcahy** during 2007; $200,000 in fees, stock awards and other compensation paid to defendant **Parsons** during 2007; $170,000 in fees, stock awards and other compensation paid to defendant **Rodin** during 2007; $43,000 in fees, stock awards and other compensation paid to defendant **Ryan** during 2007; and $231,000 in fees, stock awards and other compensation paid to defendant **Thomas** during 2007;

(c)    As members of the Audit and Risk Management Committee, defendants **Deutch (Chair), Liveris, Mulcahy, Ricciardi, Rodin, and Ryan** will take no action against one another or the other members of the Board of Directors of the Company

because each member of this Committee breached important specific duties outlined in the Audit and Risk Management Committee Charter and specified herein *infra*, by failing to prevent Citi's manipulation of the market for ARS, its deception of its own customers, and its resulting exposure to government investigations, lawsuits, and the need to repurchase or otherwise carry tens of billions of dollars of essentially worthless ARS on its books, and by causing or allowing Citi to make materially false statements about the Company, its controls, procedures, risk of loss, the value of its assets and its financial position and accounting;

(d)     As members of the Executive Committee, defendants **Rubin (Chair), Armstrong, Belda, Bischoff, Deutch, Pandit, Parsons, and Rodin** will take no action against one another or the other members of the Board of Directors of the Company because each member of this Committee breached important specific duties by failing to prevent Citi's manipulation of the market for ARS, its deception of its own customers, and its resulting exposure to government investigations, lawsuits, and the need to repurchase or otherwise carry tens of billions of dollars of essentially worthless ARS on its books, and by causing or allowing Citi to make materially false statements about the Company, its controls, procedures, risk of loss, the value of its assets and its financial position and accounting;

(e)     As members of the Personnel and Compensation Committee, defendants **Belda (Chair), Armstrong, Derr, and Parsons** will take no action against one another or the other members of the Board of Directors of the Company because each member of this Committee breached important specific duties outlined in the Personnel and Compensation Committee Charter and specified herein *infra*, by failing to prevent Citi's manipulation of the market for ARS, its deception of its own customers, and its resulting

exposure to government investigations, lawsuits, and the need to repurchase or otherwise carry tens of billions of dollars of essentially worthless ARS on its books, and by causing or allowing Citi to make materially false statements about the Company, its controls, procedures, risk of loss, the value of its assets and its financial position and accounting;

(f)     As members of the Public Affairs Committee, defendants **Rodin (Chair), Hernandez, Ryan, and Thomas** will take no action against one another or the other members of the Board of Directors of the Company because each member of this Committee breached important specific duties outlined in the Public Affairs Committee Charter and specified herein *infra*, by failing to prevent Citi's manipulation of the market for ARS, its deception of its own customers, and its resulting exposure to government investigations, lawsuits, and the need to repurchase or otherwise carry tens of billions of dollars of essentially worthless ARS on its books, and by causing or allowing Citi to make materially false statements about the Company, its controls, procedures, risk of loss, the value of its assets and its financial position and accounting;

(g)     As members of the Nomination and Governance Committee, defendants **Parsons (Chair), Armstrong, Belda, Derr, and Deutch** will take no action against one another or the other members of the Board of Directors of the Company because each member of this Committee breached important specific duties outlined in the Nomination and Governance Committee Charter and specified herein *infra*, by failing to prevent Citi's manipulation of the market for ARS, its deception of its own customers, and its resulting exposure to government investigations, lawsuits, and the need to repurchase or otherwise carry tens of billions of dollars of essentially worthless ARS on its books, and by

causing or allowing Citi to make materially false statements about the Company, its controls, procedures, risk of loss, the value of its assets and its financial position and accounting;

(h)     Defendant **Ricciardi** will take no action against the other members of the Board of Directors of the Company because he was granted entry to the Board on July 16, 2008, immediately before the New York Attorney General announced its investigation of Citi. Defendant Ricciardi was placed on the Citi Board at that specific time in an effort to create the illusion of legitimacy behind the Company's manipulation of the market for ARS, and his presence on the Board only serves as a reminder of the illegal acts and conduct complained of herein.

58.     Plaintiff has not made any demand on any shareholders of Citi to institute this action since such demand would be a futile and useless act for the following reasons:

(a)     Citi is a publicly traded company with approximately 5.4 billion shares outstanding that traded on the NYSE throughout the relevant period, which shares were held by thousands of shareholders located throughout the nation and abroad;

(b)     Making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses or telephone numbers of shareholders; and

(c)     Making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

## FACTUAL BACKGROUND

### The ARS Market and the Existence of Control Deficiencies
### And Clear "Red Flags" About the Market's Safety and Liquidity

59.    ARS are securities which have no fixed rates of return, but whose rates of return are periodically re-set – typically every 7, 14, 28, or 35 days, but in some cases even daily – by an auction process.  ARS are usually issued with maturities of 30 years, but the maturities can range from five years to perpetuity.

60.    First developed in 1984, as of today's date, the market for ARS has grown to well over $300 billion annually.  Traditionally, the market was limited to institutional investors, but the minimum investment in ARS recently was reduced to $25,000, placing these securities within the reach of individual investors.

61.    ARS are auctioned at the "par" value – i.e., a specific dollar amount worth of securities.  The pricing variable consists of the interest rate or dividend yield that the auction process determines.  The rate or yield on any ARS is supposed to be set by a "Dutch" auction in which bids with successively higher rates are accepted until all of the securities in a particular auction are sold.

62.    Investors typically can submit only the following types of orders:

(a)    a "hold" order, which is the default order for current investors (i.e., the order that is entered for a current holder if the holder takes no action), where a current investor will keep the securities at the rate at which the auction clears;

(b)    a "hold-at-rate" bid, where a current investor will only keep the securities if the clearing rate is at or above the specified rate;

(c)    a "sell" order, where a current investor will sell the securities regardless of the clearing rate; or

(d)    a "buy" bid, where a prospective investor (or current investor who desires additional securities) will buy securities if the clearing rate is at or above the specified rate.

63.    As stated by disclosures documents (such as prospectuses) issued with respect to each ARS, an investor's order is irrevocable.  The final rate at which all of the securities are sold is the "clearing rate" that applies to all of the securities in the series until the next auction.  Bids with the lowest rate and then successively higher bids are accepted until all of the sell orders are filled.  The clearing rate is the lowest rate bid sufficient to cover all of the securities for sale in the action.[1]

64.    If there are not enough bids to cover the securities for sale, then the auction fails, the issuer pays an above-market rate set by a pre-determined formula described in the disclosure documents, and all of the current holders continue to hold the securities, with some minor exceptions.  If all of the current holders of the security elect to hold their positions without bidding a particular rate, then the clearing rate, referred to as the "all-hold" rate, is a below-market rate set by a different formula.

65.    The issuer of each ARS selects one or more broker-dealers to underwrite the offering and/or manage the auction process.  Investors can only submit orders through the selected broker-

---

[1] Here is a simplified example of such an auction.  Suppose $75,000 par value of securities were for sale and the auction received four buy bids.  Bid 1 was for $25,000 at 3.05%.  Bid 2 was for $25,000 at 3.10%.  Bid 3 was for $35,000 at 3.10%.  Bid 4 was for $20,000.  In these circumstances, the "clearing rate" would be 3.10%, meaning all of the securities in the series would pay an interest rate (or yield, as the case may be) of 3.10% until the next auction.  Bid 1 would be allocated $25,000.  Bids 2 and 3 would receive pro-rata allocations of the remaining $50,000 worth of securities in proportion to the ratio of the par value bid for in each to the total par value bid for in both.  Bid 4 would receive nothing.

dealers.  During the Relevant Period, Citi was one of the largest broker-dealers participating in the ARS market.

66.     The issuer pays an annualized fee to each broker-dealer, such as Citi, engaged to manage an auction.  The fee is typically 25 basis points (i.e., 25% of 1%) for the par value of the securities managed by that broker-dealer.

67.     The issuer also selects an auction agent to collect the orders and determine the clearing rate for the auction.  Investors must submit orders for an auction to the broker-dealer by a specified deadline.  Many broker-dealers have an internal deadline by which investors must submit their orders to them.

68.     This internal deadline allows the broker-dealer sufficient time to process and submit the orders to the auction agent.  Other broker-dealers allow investors to submit orders up to the submission deadline, i.e., the deadline for all broker-dealers to submit orders to the auction agent.  The broker-dealers must submit the orders to the auction agent before the submission deadline, and usually must identify each separate order.

69.     After receiving the orders from the broker-dealers, the auction agent calculates the clearing rate that will apply until the next auction.  If there is only one broker-dealer, however, as was the case in many of the auctions managed by Citi, the broker-dealer can discern the clearing rate before submitting orders to the auction agent.

70.     The auction agent allocates the securities to the broker-dealers based on the orders they submitted.  The auction procedures generally state that orders are filled in the following order: hold orders, hold-at-rate and buy bids with a rate below the clearing rate, hold-at-rate orders with a rate at the clearing rate, and buy bids with a rate at the clearing rate.

71.    When there are more bids for securities at the clearing rate than securities remaining for sale, the securities are allocated on a pro rata basis first to the hold-at-rate bidders and then to the buy bidders.  Generally, the auction procedures require broker-dealers to follow the same hierarchy in allocating the securities to their customers.

72.    From 1984 to 2006, the ARS market had grown to more than $200 billion annually, and the fees collected by the ten or so broker-dealers who dominated the market exceeded $600 million annually.

73.    The success of the ARS market at Citi – on which Defendants' reputation and bonuses was based – depended on the perception that the market was extremely liquid.  This is because the primary target customers for ARS are investors with short-term investment goals or cash-equivalent needs.  Any hint that the ARS market was not liquid had the potential to trigger a massive sell-off by investors flocking to safer, more stable securities.  Thus, a failed auction, or even the rumor of one, was a something that Defendants sought to avoid at all cost, even if it meant steering the Company into an illegal course of action.

74.    In spite of this danger, in practice, the ARS auctions as a whole were not nearly liquid enough to support the billions of dollars' worth of these securities that broker-dealers such as Defendants caused Citi to market to investors on a daily basis.

75.    It was in order to conceal the inherent illiquidity of the ARS market that Defendants and their counterparts at other broker-dealers caused Citi and the other broker-dealers to engage in various practices designed to "support" the market, which they termed market "stabilization."  In reality, however, the conduct was nothing short of the type of market manipulation scheme that the securities laws have, for generations, proscribed.

76.    Indeed, in an administrative proceeding dated May 31, 2006, the SEC found that Citi and other broker-dealers had engaged in various illegal practices in order to make it appear that the auctions were successful and legitimate when, in fact, they were not.  These actions, and the SEC's finding, were the direct and foreseeable consequence of Defendants' having knowingly encouraged the practices in question.

77.    For example, broker-dealers such as Citi were found to have routinely taken over their customers' bid orders by filling in the blanks on open or market orders *after viewing other bidders' orders.*  This practice allowed Citi and other broker-dealers to bestow discounts on certain customers at the direct expense of other customers, and also allowed the broker-dealers to manipulate the clearing rate of the auction.

78.    In addition, broker-dealers could bid for their own accounts without disclosing this fact to customers, and the broker-dealers could ask their customers to change their orders, in both cases so as to allow the broker-dealer to:

(a)    prevent auctions from failing, thereby supporting the broker-dealers claim that the ARS market was very liquid and no auction had ever failed for want of orders; and

(b)    set artificial "market" rates, at levels essentially dictated solely by the broker-dealers themselves.

79.    The SEC also found that broker-dealers had rearranged bids through a process of "netting" of in-house buy and sell orders ahead of actual auctions in order to change the priority of bids.  Thus, before submitting bids to the auction agent, broker-dealers changed or "prioritized" their customers' bids to increase the likelihood that the bids would be filled.  As a result of this prioritization, as well as a similar practice known as "cross-trading," certain bids were secretly

moved up in the disclosed hierarchy for the order in which bids of various types would be filled. In many instances, these practices resulted in certain customers' bids displacing other customers' bids when the auction was oversubscribed, which falsely affected the clearing rate, and did not conform to the disclosed procedures.

80.    The SEC also found that Citi and other broker-dealers allowed the rampant submission or revision of bids after external and/or internal deadlines. In addition, the broker-dealers themselves submitted or revised bids after these deadlines. These practices favored investors or the broker-dealers who bid after a deadline by displacing other investors' bids, affected the clearing rate, and did not conform to the disclosed procedures.

81.    The SEC also found that broker-dealers such as Citi had collaborated with certain of their customers by asking them to bid at auctions and then compensating in the secondary market with rates that were higher than the clearing rate on the auction itself. For example, certain broker-dealers persuaded customers to submit bids at lower rates than the customers actually wanted to receive, allowing the auction to clear at the lower rate, buying the securities from the investor after the auction at the clearing rate, and then selling the securities back to the investor at the same rate but below par value. Some broker-dealers did not even trouble themselves to convince customers to submit a "straw man" bid and, instead, simply displaced those customers' bids and then sold them securities at below par value in the secondary market. Also, some broker-dealers provided higher returns to certain customers by delaying settlement dates for those customers.

82.    Finally, the SEC found that certain broker-dealers provided different "price talks"[2] to different customers, placing certain customers at an advantage over others at the expense of the others.

83.    The SEC's findings demonstrated that Defendants, and their counterparts at other broker-dealers, had caused ARS auctions to be auctions in name only and, in fact, were an illegal market made and manipulated by the broker-dealers themselves.  As a consequence of Defendants' and others' knowingly encouragement of these practices, fifteen broker-dealers, including Citi, were fined $13 million, censured by the SEC, and ordered to cease and desist from those practices.

84.    In another SEC administrative proceeding dated May 7, 2007, Citi agreed to pay an additional $200,000 in fines on behalf of one of its affiliates, Legg Mason Wood Walker Inc. ("LMWW"), a broker-dealer acquired by Citi in December 2005, for Law's pre-December 2005 misdeeds.

85.    Despite the fines and cease-and-desist orders imposed by the SEC, Defendants knowingly caused Citi to continue to engage in various practices to artificially bolster the auction markets, exposing the Company to greatly enhanced criminal and civil liability.

**After 2007, Defendants Abandon the Auction Market, and It Collapses**

86.    In 2007, a credit crisis of unprecedented levels swept across the United States economy that continues to roil the nation's financial markets.

87.    By the middle of 2007, banks had stopped financing private equity deals, the prices of U.S. residential real estate had gone into a steep decline, and the mortgage market for sub prime

---

[2] Price talk is a broker-dealer's estimate of the likely range within which an auction will clear.

borrowers had essentially shut down.  The collapse of the credit markets forced financial institutions such as Citi to report tens of billions of dollars in losses and write downs.  The collapse also began to infect the ARS market.  Citi was especially hard hit and was forced to seek additional capital infusions quickly.

88.    By the middle of 2007, the demand for ARS by Citi's corporate and institutional clients essentially dried up.  This shift was driven, in large part, by a March 2007 decision by the Financial Accounting Standards Board ("FASB") requiring ARS to be listed on investors' balance sheets as "short-term investments" rather than "cash equivalents."  Corporate investors responded to this by disposing of their ARS so that their balance sheet cash positions would not be reduced as result of the FASB decision, and their liquidity ratings would not suffer.  As a consequence, Citi was forced to retain more ARS inventory on its books than it could financially handle.

89.    Despite these developments, Defendants struggled to maintain the illusion of a healthy and liquid market for these securities at Citi.

90.    Thus, rather than disclose the weakening demand for ARS, Defendants caused Citi to *market ARS to customers even more intensely as a liquid cash alternative*.  Indeed, Defendants caused Citi to represent such securities expressly as "money market and auction instruments" in the Company's monthly account statements to customers.

91.    Defendants engaged in this conduct, among other reasons, so that Citi could unload millions of dollars in ARS that the Company had in its inventory to its own customers before those securities became essentially worthless.

92.    By August 16, 2007, several monthly auctions had failed amidst the turmoil in the credit markets.  Investors did not show to bid in auctions that month for about 60 auctions worth $6

billion of ARS.  Also, some credit ratings agencies were advising that "they would not be surprised to see further failed auctions in the days or weeks ahead."

93.     Thereafter, auctions began failing with regularity, and those few that did succeed would have failed but for the intervention of Citi and the other broker-dealers themselves. Defendants caused Citi to continue to intervene so as to prop up the auction market by bidding with knowledge of other bids, by submitting bids after the internal bidding deadlines imposed on investors, and by directly or indirectly influencing or setting the clearing rates.  In short, despite their awareness that there was, in fact, no legitimate auction demand for ARS, Defendants continued to actively market and sell ARS as a liquid cash alternative, exposing the Company to irremediable damage to its reputation and millions of dollars in civil and criminal penalties.

94.     Then, after unloading as many ARS as they could from Citi's inventory onto unsuspecting customers, Defendants directed Citi to stop supporting auctions altogether and simply "walk away" from the ARS market.

95.     Thus, on February 13, 2008, 87 percent of the auctions for ARS failed when Citi and other broker-dealers were caused by Defendants and their counterparts to pull the plug.  Thousands of investors, holding millions of dollars of ARS purchased from Citi, were now left with highly illiquid, and essentially worthless, investments.

96.     The debacle has had a near-ruinous impact on Citi.  The Company received subpoenas from state agencies in Texas, New York, Massachusetts, and other states relating to sales of ARS.  In March 2008, a group of such investors filed a class action in this Court seeking redress directly from Citi.  *See LHB Insurance Brokerage, Inc., et al. v. Citigroup, Inc. and Citigroup Global Markets, Inc.* (S.D.N.Y. filed March 26, 2008).  The SEC commenced a formal investigation.

97.    On August 1, 2008, New York Attorney General Andrew Cuomo announced that his office intended to file charges against Citi concerning its fraudulent marketing of ARS to investors. According to the New York Attorney General, Citi had "repeatedly and persistently committed fraud by material misrepresentations and omissions" in the underwriting, distribution and sale of ARS, touting them as safe, cash-equivalent investments. The Attorney General also accused Citi of having "destroyed recordings of telephone conversations" related to the marketing and sales of ARS. (Of course, the alleged fraud, as well as the alleged destruction of evidence, as outlined by the Attorney General, could not have occurred but for the knowing direction of Defendants.)

98.    Less than one week after the announcement by the New York Attorney General – in what can only be characterized as an implicit admission of wrongdoing – Defendants announced that they had caused the Company to settle the Attorney General's charges – as well as the SEC's formal order of investigation.

99.    Thus, on August, 7, 2008, the Company announced that it had settled the charges concerning ARS by the SEC and the New York Attorney General. The settlement was particularly onerous and included the following terms:

(a)    By November 5, 2008, Citi would purchase at par ARS that were not auctioning from all Citi individual investors, small institutions (as defined by the terms of the settlement), and charities that purchased ARS from Citi prior to February 11, 2008. The Company estimated that the par value of those assets totaled $7.3 billion;

(b)    Citi would be barred from liquidating another $8 billion of its own holdings of ARS until its customers' holdings had been liquidating;

(c)    Citi would offer non-recourse loans to individual investors, small institutions, and charities up to the par amount of their ARS – regardless of those customers' creditworthiness;

(d)    Citi would use its "best efforts" to work with ARS issuers and other interested parties to provide liquidity to the Company's institutional investor clients.  This would take the form of facilitating issuer redemptions or actually resecuritizing these investors' holdings of ARS;

(e)    The New York Attorney General will monitor Citi's progress and, beginning on November 4, 2008, retains the right to take legal action against Citi with respect to its institutional investor clients.  The SEC and other regulators will retain the right to take legal action as of December 31, 2009;

(f)    Citi would refund the refinancing fees paid by municipal ARS issuers that issued ARS in the primary market between August 1, 2007 and February 11, 2008, and refinanced those securities after February 11, 2008;

(g)    Citi agreed to pay a $50,000,000 fine to the State of New York and a $50,000,000 to the other state regulatory agencies; and

(h)    The SEC reserved its right to impose a fine in the future, depending on how Citi complies with the terms of the settlement.

100.    The import of these settlements is that Defendants have caused Citi to maintain inventories of ARS in the par amount of **over $15 billion** that are drastically diminished in value, if not worthless.

101.    Citi's settlement with a few state agencies, of course, does not preclude private lawsuits on behalf of investors harmed by Defendants' actions:  First, the settlements only cover individuals, charities, and small institutions – not large corporate customers who constituted the bulk of Citi's ARS business.  For example, *Financial Week* [6/2/08] reported that some corporate investors in ARS backed by collateralized debt obligations would have to take huge charges, as those ARS had become, for all intents and purposes, worthless:

> Companies that held auction-rate paper backed by collateralized debt obligations, for example, had little hope of recovering their money and were more likely to take a charge. That happened at Bristol-Myers Squibb, whose ARS have a par value of $807 million. The company has taken $456 million in impairment charges, $300 million of which were permanent.

Second, although the settlements require repurchases at par from the smaller investors, even those investors may have valid causes of action (e.g., for having had their assets frozen) against Citi, exposing it to millions of dollars in damages.  The *LHB Brokerage* action is just one of many actions that can be expected to be filed against Citi as a result of Defendants' ARS debacle.

102.    The negative impact on Citi is not hypothetical.  So far this year alone, as a consequence of Defendants' acts and omissions regarding the ARS market and other malfeasance, the Company has been required to raise at least $30 billion in new capital since November 2007. Moreover, the Company posted over $16 billion in write downs for the first quarter of 2008.

## MATERIALLY FALSE AND MISLEADING STATEMENTS REGARDING DEFENDANTS' MANIPULATION OF THE ARS MARKET AND THE IMPACT ON CITI

103.    Throughout the Relevant Period, Defendants issued public statements about the financial condition of Citi that were false because they omitted to disclose the burgeoning Company's burgeoning exposure to losses on its inventories of ARS.  Thus, while they were

deceiving the Company's own customers, manipulating the market for ARS, and, by February 2008, unloading billions of dollars in illiquid ARS on unsuspecting investors, Defendants knowingly concealed from shareholders the fact that most of the ARS in its inventories were illiquid, unmarketable, and essentially worthless, knowingly failed to take necessary write downs on those securities, and knowingly exposed the Company to billions of dollars in liability for settlements and lawsuits arising from their fraudulent practices.  Thus, from at least July 1, 2007 to August 7, 2008, each of Defendants' statements about the financial results of the Company were materially misleading, and Defendants knew or consciously disregarded this fact.

104.    On July 20, 2007, although Defendants' conscious manipulation of the ARS market and exposure of the Company to losses in the tens of billions of dollars was well under way, Defendants caused the company to announce its results for the second quarter of 2007 to the public, including shareholders.  Defendants announced "record income" from continuing operations of $6.2 billion.  Defendant Charles Prince was quoted as saying that "[o]ur capital markets-driven business performed extremely well . . . ."  Defendants did not breathe one word concerning the ARS market or Defendants' manipulation thereof or the Company's multi-billion exposure thereto.  This act constituted a deliberate, material omission of the fact that Citi was exposed to tens of billions of dollars in ARS losses, write downs, and settlements.

105.    Similarly, in August 2007, Defendants caused the company to issue its Form 10-Q for the second quarter of 2007 to the public, including shareholders, also without saying anything about the ARS market or Defendants' manipulation thereof or the Company's multi-billion exposure thereto.  This act constituted a deliberate, material omission of the fact that Citi was exposed to tens of billions of dollars in ARS losses, write downs, and settlements.

106.    On October 15, 2007, Defendants caused the company to announce its results for the third quarter of 2007 to the public, including shareholders.  Defendants announced net income of $2.2 billion.  Although Defendants spoke generally about the negative impact of the current credit markets, they reported positive revenues in fixed-income securities and they said nothing concerning the ARS market, or Defendants' manipulation thereof or the Company's multi-billion-dollar exposure thereto.  This act constituted a deliberate, material omission of the fact that Citi was exposed to tens of billions of dollars in ARS losses, write downs, and settlements.

107.    Similarly, in November 2007, Defendants caused the company to issue its Form 10-Q for the third quarter of 2007 to the public, including shareholders, without saying anything about the ARS market or Defendants' manipulation thereof or the Company's multi-billion exposure thereto.  This act constituted a deliberate material omission of the fact that Citi was exposed to tens of billions of dollars in ARS losses, write downs, and settlements.

108.    On January 15, 2008, Defendants caused the company to announce its results for the fourth quarter of, and full year, 2007.  Defendants announced a net loss of $9.93 billion for the quarter, and net income of $3.62 billion for the year.  Although the quarterly loss was large, Defendants once again said nothing concerning the ARS market, or Defendants' manipulation thereof or the Company's multi-billion-dollar exposure thereto.  This act constituted a deliberate, material omission of the fact that Citi was exposed to tens of billions of dollars in ARS losses, write downs, and settlements.

109.    Similarly, in February 2008, Defendants caused the Company to issue its Form 10-K for the fourth quarter and full year 2007 to the public, which omitted key material facts about the Company's exposure to the ARS market as a result of Defendants' actions.  Regarding ARS,

Defendants stated – in a cursory summary on the first page of the annual report – that "credit markets are difficult. These credit markets negatively affect a wide range of products, including auction rate securities, credit default swaps and the leveraged loan syndication market." This statement was materially false in that it omitted to disclose that, as a result of Defendants' actions, Citi was exposed to tens of billions of dollars in ARS losses, write downs, and settlements.

110. On April 18, 2008, Defendants caused the company to announce its results for the first quarter of 2008. Defendants announced a net loss of $5.1 billion for the quarter, including write downs of $1.5 billion on auction rates securities inventory. Although the quarterly loss was large, Defendants deliberately understated the impact of the Company's exposure to the ARS market and their own manipulation thereof. This act constituted a deliberate, material omission of the fact that Citi was exposed to tens of billions of dollars in ARS losses, write downs, and settlements.

111. Indeed in the April 18, 2008, announcement, defendant Pandit provided reassurances to shareholders that he knew to be false:

> We have taken **decisive and significant actions to strengthen our balance sheet,** including over $30 billion of capital raised during December and January, a significant increase in our credit reserves, . . . and the realignment of and pending asset reductions in our mortgage business. **We continue to enhance our risk management processes, our capital productivity and expense containment,** as well as our ability to deliver innovative, world-class products **that meet our clients' specific needs.** To achieve this, we recently reorganized the businesses along regional and product lines to bring us closer to our clients. At the same time, we are taking the necessary steps to make Citi more efficient while fostering a culture of accountability and teamwork.

112. These statements were false in that, known to Defendants but unknown to shareholders, Defendants had caused the Company to fail, in highly material respects, to strengthen its balance sheet, enhance its risk management processes and capital productivity, meet its clients' needs, or make the Company more efficient while fostering a culture of accountability and

teamwork.  In actual fact, Defendants had caused and were causing the Company to seriously harm many customers in the ARS market and become exposed to tens of billions of dollars in ARS losses, write downs, and settlements.

113.  Reporting on the Company's $5.1 billion loss for the first quarter of 2008 in the Company's Form 10-Q filed in May 2008, Defendants stated that such losses had included "write-downs of $1.5 billion on auction rate securities inventory . . . ."  Defendants also stated that the value of the Company's inventory of ARS was $6.5 billion.  In addition, Defendants stated that Citi classified its ARS "as trading securities and accounts for them on a fair-value basis with all changes in far value recorded in earnings."  All of these statements were materially false in that they misstated the Company's true exposure to ARS and omitted to disclose that, as a result of Defendants' actions, Citi was exposed to tens of billions of dollars in ARS losses, write downs, and settlements.

114.  On July 18, 2008, Defendants caused the company to announce its results for the second quarter of 2008.  Defendants announced a net loss of $2.5 billion for the quarter.  Although the quarterly loss was large, Defendants deliberately understated the impact of the Company's exposure to the ARS market and their own manipulation thereof.  Defendants even boasted of a "197 million **gain** on auction rate securities inventory."  These acts constituted deliberate, material omissions of the fact that Citi was exposed to tens of billions of dollars in ARS losses, write downs, and settlements from its manipulation of the ARS market.

115.  In reporting on the Company's $2.5 billion loss for the second quarter of 2008 in the Company's Form 10-Q filed in August 2008, Defendants stated that year-to-date losses on the ARS inventory had been reduced to $1.3 billion, that the inventory was now worth $5.6 billion, and that

"liquidity returned to the [ARS] market . . . ," and that Citi classified its ARS "as trading securities and accounts for them on a fair-value basis with all changes in far value recorded in earnings." All of these statements were materially false in that they misstated the Company's true exposure to ARS and omitted to disclose that, as a result of Defendants' actions, Citi was exposed to tens of billions of dollars in ARS losses, write downs, and settlements.

## THE TRUE FACTS ARE BELATEDLY DISCLOSED

116.    The truth concerning Defendants' deliberate misstatements and omissions to shareholders only began to emerge in early August 2008, when Defendants announced the settlements with state and federal regulators having a **$15 billion** potential impact on the Company.

## INSIDER SELLING

117.    Between July 20, 2007 and the present, during the height of Defendants' deception of customers in, and manipulation of, the ARS market and the aftermath of these actions, defendants **Bischoff, Rubin, Crittenden, Volk, Kaden, Forese, and Gerspach** (the Insider Selling Defendants), while in possession of material, non-public information regarding the Company's exposure to losses, settlements, and liability in the ARS market, sold almost **$5,440,064 million** in Citi stock on the basis of their inside information.

118.    Each of the Insider Selling Defendants sold stock in the amounts set forth in paragraphs 24, 33, 37, 41, 44, 47 and 48, *supra*.

119.    The sales by the Insider Selling Defendants constituted a breach of their fiduciary duties to the Company. In addition, it violated Citi's corporate policy as contained in the Company's Code of Conduct.

## ADDITIONAL BREACHES OF FIDUCIARY
## DUTIES AND GROSS MISMANAGEMENT

120.    The Defendants breached their duties of loyalty and good faith by allowing or causing the Company to misrepresent its financial results and prospects, as detailed herein, and by failing to prevent illegal actions related to the misrepresentation.

121.    As set forth above, Defendants had a duty to Citi that the Company's financial reporting fairly presented, in all material respects, the operations and financial condition of the Company.  In order to adequately carry out this duty, it is and was necessary for the Defendants to know and understand the material, non-public information to be either disclosed or omitted from the Company's public statements.  Here, this material, non-public information included: (i) the fact that the Company was taking advantage of investors and customers in its ARS line of business and manipulating the market for these securities; and (ii) the fact that the Company's financial statements were materially misstated due to, among other things, Defendants' failure to properly value, and discount, the ARS in its portfolio due to their inherent illiquidity.

122.    Furthermore, the Director Defendants, as members of the respective committees of the Board, had special duties that included knowing and understanding the material information as set out in the charters of each of the respective committees, which provides that each committee's responsibilities include: (i) overseeing evaluation of the Company's internal accounting controls; (ii) reviewing the Company's financial reports and accounting standards and principles; and (iii) overseeing internal audits.  It was also the duty and responsibility of the Audit and Risk Management Committee to communicate the results of its exercise of reasonable judgment to the full Board of Directors and for the full Board to ultimately monitor and oversee the Audit and Risk Management Committee itself.

123.    The Officer Defendants had ample opportunity to discuss this material information with their fellow officers at management meetings and via internal corporate documents and reports. Moreover, the Director Defendants had a duty to discuss this material information with management and fellow directors at any of the Board's meetings or at any of the meeting of the committees of the Board.

124.    The Defendants' conduct as set forth herein constituted conscious misbehavior and recklessness. Each of the Officer Defendants was charged with overseeing the risk, valuation, and integrity of the Company's loan portfolios and capital position, and each of the Director Defendants was not only responsible for the Company's financial well-being as a whole but also sat on one or more committees of the Board specifically requiring him or her to be actively involved in the oversight of the officers managing the Company's portfolio:  (a) Deutch, Liveris, Mulcahy, Ricciardi, Rodin, Ryan (Audit and Risk Management Committee); (b) Armstrong, Belda, Bischoff, Deutch, Pandit, Parsons, Rodin, Rubin (Executive Committee); (c) Armstrong, Belda, Derr, Parsons (Personnel and Compensation Committee); (d) Hernandez, Rodin, Ryan, Thomas (Public Affairs Committee); and (e) Armstrong, Belda, Derr, Deutch, Parsons (Nomination and Governance Committee). Each of these Committees did, in fact, actively direct and control the Company's affairs during the Relevant Period. In 2007, the full Board met 13 times, the Audit and Risk Management Committee met 12 times, the Personnel and Compensation Committee met 8 times, and the Nomination and Governance Committee met 5 times.

## ADDITIONAL DAMAGES TO CITI AND SHAREHOLDERS

125.    As a result of Defendants' illegal actions and course of conduct during the Relevant Period, the Company is now subject to drastically increased costs, both of operating in the normal

course, and of satisfying extraordinary obligations incurred as a result of Defendants' malfeasance. Such expenditures include, but are not limited to:

(a)    costs incurred in connection with the investigation by the New York Attorney General;

(b)    costs incurred in connection with the investigation by the SEC;

(c)    costs incurred in connection with the investigation by other state and/or federal agencies;

(d)    costs incurred in connection with defending investor class actions related to Defendants' manipulation of the market for ARS, expected to exceed tens or hundreds of millions of dollars in legal fees and settlement costs;

(e)    costs incurred to correct the Company's internal control procedures to material weaknesses in the Company's valuations of its subprime mortgage assets;

(f)    increased costs of capital as a result of a lowered share price

(g)    potentially tens of millions of dollars in settlements to satisfy adverse judgments and/or potential fines in connection with other government investigations;

(h)    costs incurred from increased Directors and Officers' Insurance ("D&O Insurance") premiums as a result of the manipulation of the ARS market;

(i)    costs incurred from potential losses of large trading partners who do not want to be associated with businesses that improperly manage their accounting; and

(j)    costs of downgrades of Citi's debt and securities by financial analysts and creditors, due to concerns about the Company's financial reporting.

126.    The Defendants' actions have irreparably damaged Citi's corporate image and goodwill.

## DEFENDANTS' DUTIES

127.    Defendants had stringent duties to Citi and its shareholders.  These duties arose by operation of law and were imposed upon them by the Company, by virtue of their positions at the Company.

### Duties at Law

128.    By reason of their positions as officers, directors, and/or fiduciaries of Citi and because of their ability to control the business and corporate affairs of Citi, the Defendants owed Citi and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Citi in a fair, just, honest and equitable manner.  The Defendants were and are required to act in furtherance of the best interests of Citi and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

129.    Each director and officer of the Company owes to Citi and its shareholders the fiduciary duty to exercise good faith, loyalty, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and to uphold the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, the Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's revenue, margins, operations, performance, management, projections and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.  In order to adequately carry out these duties, it is necessary for the Defendants to know and

understand the material, non-public information should be either disclosed or not disclosed in the Company's public statements.

130.     The Defendants, because of their positions of control and authority as directors and/or officers of Citi, were able to, and did, exercise control over the wrongful acts complained of herein and over the contents of the various public statements issued by the Company.  Because of their advisory, executive, managerial and directorial positions with Citi, each of the Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Citi.

131.     To discharge their duties, the officers and directors of Citi were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Citi were required to, among other things:

(i)      refrain from acting in any manner so as to favor the personal interest of the Directors or Officers of the Company at the expense of the best interest of the Company and its shareholders;

(ii)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate information to shareholders, the investing public, and the SEC;

(iii)    conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the Company's value;

(iv)    properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(v)    ensure that management was conducting legal, fair, and honest transactions with customers, and was not employing artifices or manipulations to maintain so-called "liquid" markets in securities, including ARS, that were not, in fact, liquid;

(vi)    ensure that financial records and asset values were true, accurate and reliable and that such values reflected the real (even if impaired) value of such assets, including ARS;

(vii)    remain informed as to how Citi conducted its operations, and, upon receipt or notice of information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws;

(viii)    ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations;

(ix)    ensure that sufficient checks and balances in Citi's accounting and finance functions, and related functions, were strong enough to prevent accounting irregularities, internal-controls problems, misevaluation of ARS, manipulation of customer orders for ARS, and deception regarding ARS;

(x)     ensure that no inaccurate financial information about Citi was released to the public that would tend to artificially inflate Citi's stock, and that would thus cause corresponding or greater harm to the Company's value when the truth was revealed; and

(xi)     ensure that valuable corporate assets would not be wasted in payments of excessive bonus payments to executives who ruined the financial health and stability of the Company.

132.     Each Defendant, by virtue of his or her position as a director and/or officer of Citi, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Citi, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders.

133.     The Defendants were aware, or should have been aware, that those violations, absences of good faith, and the reckless disregard of duties posed a risk of serious injury to the Company.  The conduct of the Defendants who were also officers and/or directors of the Company during the relevant period has been ratified by the remaining Defendants who collectively comprised all of Citi's Board during the relevant period.

### Corporate Duties

134.     Citi emphasized its commitment to putting clients first.  The Company's Statement of Shared Responsibilities stated, in relevant part:

STATEMENT OF SHARED RESPONSIBILITIES

Citigroup's goal is to be the most respected global financial services company. As a great institution with a unique and proud history, we play an important role in the global economy. Each member of the Citigroup family has three Shared Responsibilities:

We have a responsibility to
OUR CLIENTS.

We must put our clients first, provide superior advice, products and services, and always act with the highest level of integrity.

135.    Moreover, Citi had adopted a Financial Code of Conduct for all its financial

professionals, including Defendants, as follows:

1.    OVERVIEW

1.1    OBJECTIVE, SCOPE AND TARGET AUDIENCE

The Citi Code of Ethics for Financial Professionals applies to the principal executive officer of Citi and its reporting subsidiaries and all professionals worldwide serving in a finance, controllers, treasury, tax or investor relations role.

Citi expects all of its employees to act in accordance with the highest standards of personal and professional integrity in all aspects of their activities, to comply with all applicable laws, rules and regulations, to deter wrongdoing and abide by the Citigroup Code of Conduct and other policies and procedures adopted by Citi that govern the conduct of its employees. This Code of Ethics is intended to supplement the Citigroup Code of Conduct.

2.    POLICY STATEMENT

Citi Code of Ethics for Financial Professionals

You agree to:

a) Engage in and promote honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

b) Avoid conflicts of interest and to disclose to the Director of Citigroup Global Compliance any material transaction or relationship that reasonably could be expected to give rise to such a conflict;

c) Take all reasonable measures to protect the confidentiality of non-public information about Citi or its subsidiaries and their customers obtained or created in connection with your activities and to prevent the unauthorized disclosure of such information unless required by applicable law or regulation or legal or regulatory purposes;

d) Produce full, fair, accurate, timely and understandable disclosure in reports and documents that Citi or its subsidiaries files with, or submits to, the Securities and Exchange Commission and other regulators and in other public communications made by Citigroup or its subsidiaries;

e) Comply with applicable governmental laws, rules and regulations, as well as the rules and regulations of self-regulatory organizations of which Citi or its subsidiaries is a member; and

f) Promptly report any possible violation of the Code of Ethics to the Director of Citigroup Global Compliance or any of the parties or channels listed in the Citigroup Code of Conduct.

You are prohibited from directly or indirectly taking any action to fraudulently influence, coerce, manipulate or mislead Citi or its subsidiaries' independent public auditors for the purposes of rendering the financial statements of Citi or its subsidiaries misleading.

You understand that you will be held accountable for your adherence to this Code of Ethics. Your failure to observe the terms of this Code of Ethics may result in disciplinary action, up to and including termination of employment. Violations of this Code of Ethics may also constitute violations of law and may result in civil and criminal penalties for you, your supervisors and/or Citi.

136.    In addition, in May 2008, Citi adopted "Corporate Governance Guidelines" to ensure

the faithful fulfillment of the codes of conduct and the duties of officers and directors:

CORPORATE GOVERNANCE GUIDELINES
As of May 27, 2008

Corporate Governance Mission

Citigroup Inc. (the "Company") aspires to the highest standards of ethical conduct: doing what we say; reporting results with accuracy and transparency; and maintaining full compliance with the laws, rules and regulations that govern the Company's businesses.

Board of Directors

The Board of Directors' primary responsibility is to provide effective governance over the Company's affairs for the benefit of its stockholders, and to balance the interests of its diverse constituencies around the world, including its customers, employees, suppliers and local communities. In all actions taken by the Board, the Directors are expected to exercise their business judgment in what they reasonably believe to be the best interests of the Company. In discharging that obligation, Directors may rely on the honesty and integrity of the Company's senior executives and its outside advisors and auditors.

* * *

Lead Director

The Board may appoint a Lead Director. The Lead Director shall: (i) preside at all meetings of the Board at which the Chairman is not present, including executive sessions of the independent Directors; (ii) serve as liaison between the Chairman and the independent Directors; (iii) approve information sent to the Board; (iv) approve meeting agendas for the Board; (v) approve meeting schedules to assure that there is sufficient time for discussion of all agenda items; (vi) have the authority to call meetings of the independent Directors; and (vii) if requested by major shareholders, ensure that he or she is available for consultation and direct communication.

* * *

Board Committees

The standing committees of the Board are the Executive Committee, the Audit and Risk Management Committee, the Personnel and Compensation Committee, the Nomination and Governance Committee and the Public Affairs Committee. All members of the Audit and Risk Management Committee, the Personnel and Compensation Committee and the Nomination and Governance Committee shall meet the independence criteria, as determined by the Board, set forth in the NYSE corporate governance rules, and all other applicable laws, rules or regulations regarding director independence. Committee members shall be appointed by the Board upon recommendation of the Nomination and Governance Committee, after consultation with the individual Directors. Committee chairs and members shall be rotated at the recommendation of the Nomination and Governance Committee.

Each committee shall have its own written charter which shall comply with the applicable NYSE corporate governance rules, and other applicable laws, rules and regulations. The charters shall set forth the mission and responsibilities of the committees as well as qualifications for committee membership, procedures for

committee member appointment and removal, committee structure and operations and reporting to the Board.

The Chair of each committee, in consultation with the committee members, shall determine the frequency and length of the committee meetings consistent with any requirements set forth in the committee's charter. The Chair of each committee, in consultation with the appropriate members of the committee and senior management, shall develop the committee's agenda. At the beginning of the year, each committee shall establish a schedule of major topics to be discussed during the year (to the degree these can be foreseen). The agenda for each committee meeting shall be furnished to all Directors in advance of the meeting, and each independent Director may attend any meeting of any committee, whether or not he or she is a member of that committee.

The Board and each committee shall have the power to hire and fire independent legal, financial or other advisors as they may deem necessary, without consulting or obtaining the approval of senior management of the Company in advance.

The Board may, from time to time, establish or maintain additional committees as necessary or appropriate.

* * *

Director Access to Senior Management

Directors shall have full and free access to senior management and other employees of the Company. Any meetings or contacts that a Director wishes to initiate may be arranged through the CEO or the Secretary or directly by the Director. The Board welcomes regular attendance at each Board meeting by senior management of the Company. If the CEO wishes to have additional Company personnel attendees on a regular basis, this suggestion should be brought to the Board for approval.

* * *

Code of Conduct and Code of Ethics for Financial Professionals

The Company has adopted a Code of Conduct and other internal policies and guidelines designed to support the mission statement set forth above and to comply with the laws, rules and regulations that govern the Company's business operations. The Code of Conduct applies to all employees of the Company and its subsidiaries, as well as to Directors, temporary workers and other independent contractors and consultants when engaged by or otherwise representing the Company and its interests. In addition, the Company has adopted a Code of Ethics for Financial Professionals, which applies to the principal executive officers of the Company and

its reporting subsidiaries and all professionals worldwide serving in a finance, accounting, treasury, tax or investor relations role. The Nomination and Governance Committee shall monitor compliance with the Code of Conduct, the Code of Ethics for Financial Professionals and other internal policies and guidelines.

Recoupment of Unearned Compensation

If the Board learns of any misconduct by an Executive Officer that contributed to the Company having to restate all or a portion of its financial statements, it shall take such action as it deems necessary to remedy the misconduct, prevent its recurrence and, if appropriate, based on all relevant facts and circumstances, punish the wrongdoer in a manner it deems appropriate. In determining what remedies to pursue, the Board shall take into account all relevant factors, including whether the restatement was the result of negligent, intentional or gross misconduct. The Board will, to the full extent permitted by governing law, in all appropriate cases, require reimbursement of any bonus or incentive compensation awarded to an Executive Officer or effect the cancellation of unvested restricted or deferred stock awards previously granted to the Executive Officer if: a) the amount of the bonus or incentive compensation was calculated based upon the achievement of certain financial results that were subsequently the subject of a restatement, b) the executive engaged in intentional misconduct that caused or partially caused the need for the restatement, and c) the amount of the bonus or incentive compensation that would have been awarded to the executive had the financial results been properly reported would have been lower than the amount actually awarded. In addition, the Board could dismiss the Executive Officer, authorize legal action for breach of fiduciary duty or take such other action to enforce the executive's obligations to Citigroup as may fit the facts surrounding the particular case. The Board may, in determining the appropriate punishment factor take into account penalties or punishments imposed by third parties, such as law enforcement agencies, regulators or other authorities. The Board's power to determine the appropriate punishment for the wrongdoer is in addition to, and not in replacement of, remedies imposed by such entities.

137.    Citi also had a "Code of Conduct" applicable to the entire Company, including

Defendants:

## CODE OF CONDUCT

Fair Treatment

Citi is committed to dealing fairly with its clients, vendors, competitors and employees. No person may take unfair advantage of anyone through manipulation, concealment, abuse of confidential information, misrepresentation of material facts or other unfair dealings or practice. Many countries have "fair lending" or "fair

access" laws that prohibit discrimination against prospective or actual clients. We live within the letter of these laws and regulations, and also embrace their spirit and intent.

Fiduciary Duties

Citi acts as a fiduciary in certain investment advisory and other client relationships. You should determine when fiduciary duties arise and keep in mind that a fiduciary has a legal duty to act in the best interests of its clients—putting its clients' interests ahead of its own interests, or the interests of its affiliates or employees. A fiduciary must disclose conflicts of interest with its clients or, in some cases, avoid such conflicts entirely due to legal requirements. A fiduciary's duties also require it to treat clients fairly and not to favor one client over another. See the Citi Fiduciary Policy at www.citigroup.net/policydirectory for further information.

* * *

Insider Trading

Citi policy and the laws of many countries prohibit trading in the securities (including equity securities, convertible securities, options, bonds and any stock index containing the security) of any company while in possession of material, nonpublic information (also known as "inside information") regarding the company. This prohibition applies to Citi securities as well as to the securities of other companies. It applies to transactions for any Citi account, client account or personal account. A personal account is any account in which you have a financial or beneficial interest, or the power to affect or ability to influence trading or investment decisions, either directly or indirectly. Personal accounts typically include accounts of spouses, domestic partners, children and other members of your household, and accounts over which you have investment discretion.

If you believe you have come into possession of inside information, you may not execute any trade in the securities of the subject company without first consulting with your business unit's internal legal counsel, who will then determine whether such trade would violate Citi policy or applicable laws. The definition of "material, nonpublic information" is broad. Information is "material" (and hence, potentially subject to the prohibition on insider trading) if there is a substantial likelihood that a reasonable investor would consider the information important in determining whether to trade in a security, or if the information, if made public, likely would affect the market price of a company's securities. Information may be material even if it relates to future, speculative or contingent events, and even if it is significant only when considered in combination with publicly available information.

Information is considered to be "nonpublic" unless it has been publicly disclosed, and adequate time has passed for the securities markets to digest the information. Examples of adequate disclosure include public filings with securities regulatory authorities and the issuance of press releases, and may also include meetings with members of the press and public.

It is also illegal in many countries to "tip" or pass on inside information to any other person if you know or reasonably suspect that the person receiving such information from you will misuse such information by trading in securities or passing such information on further, even if you do not receive any monetary benefit from the tippee. Trading on or conveying material nonpublic information may also breach contractual obligations assumed by Citi to or on behalf of clients. Consequences for insider trading violations can be severe, including employment termination, civil and/or criminal penalties for you, the tippee(s) and Citi, as well as irreparable damage to our reputation and public trust.

\* \* \*

Fair and Free Markets

Citi is committed to promoting free and competitive markets. Any attempt by a Citi representative to manipulate or tamper with the markets or the prices of securities, options, futures or other financial instruments will not be tolerated. Citi's goal is to ensure candor and honesty in all its dealings, including those with any U.S. or non-U.S. federal, state or local governmental body, any self-regulatory organization of which Citi or any of its affiliates is a member, and the public.

\* \* \*

Conclusion

We at Citi aspire to the highest standards of ethical and professional conduct—working to earn and maintain our clients' trust, day in and day out. In the thousands of decisions we make and actions we take every day, we affirm our commitment to this Code of Conduct and to deliver value to our clients, our people, our shareholders and our communities. This Code summarizes key policies of which you need to be aware as a member of our global community. You are encouraged to seek additional guidance or help by going to our Global Policy website at http://www.citigroup.net/policydirectory; or by seeking help from your supervisor, management, human resources, internal legal counsel, compliance officer, the Ethics Office, your business website or any of the resources listed on the following page.

138.    In addition, the charters of the various Committees of the Company's Board also imposed enhanced duties on the Director Defendants sitting on those Committees.

139.    Pursuant to its Charter, the Audit and Risk Management Committee had the following duties and responsibilities:

Meetings and Access

• Meet as often as it determines, but not less frequently than quarterly.

• Meet separately, periodically, with management, ARR, Risk Management and independent auditors.

• Regularly report to the Board on the Committee's activities.

• Annually review and report to the Board on its own performance.

• Review and assess the adequacy of this Charter annually and recommend any proposed changes to the Board for approval.

Financial Statement, Disclosure and Risk Management Matters

• Review and discuss with management and the independent auditors the annual audited financial statements, including disclosures made in "Management's Discussion and Analysis of Financial Condition and Results of Operations" (MD&A), and recommend to the Board whether the audited financial statements should be included in Citigroup's Form 10-K.

• Review and discuss with management and the independent auditors the quarterly financial statements, including disclosures made in MD&A and the results of the independent auditors' reviews of the quarterly financial statements, prior to the filing of Citigroup's Form 10-Q.

• Discuss generally Citigroup's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies. The Committee need not discuss in advance each earnings release or each instance in which Citigroup may provide earnings guidance.

• Receive a disclosure from the Chief Executive Officer and Chief Financial Officer during their certification process for the 10-K and 10-Q's about (1) any significant deficiencies and material weaknesses in design or operation of internal controls over

financial reporting and (2) any fraud, whether or not material, involving management or other employees who have a significant role in Citigroup's internal controls.

• Review and discuss periodically reports from the independent auditors on, among other things, certain:

     —critical accounting policies and practices to be used;

     —Alternative treatments of financial information within generally accepted accounting principles;

     —Other material written communications between the independent auditors and management, such as any management letter and Citigroup's response to such letter or schedule of unadjusted differences; and

     —Difficulties encountered in the course of the audit work, including any restrictions on the scope of activities or access to requested information, any significant disagreements with management, and communications between the audit team and the audit firm's national office with respect to difficult auditing or accounting issues presented by the engagement.

• Review and discuss with management and the independent auditors, at least annually:

     --Developments and issues with respect to reserves;

     --Regulatory and accounting initiatives, as well as off-balance sheet structures, and their effect on Citigroup's financial statements; and

     --Accounting policies used in the preparation of Citigroup's financial statements (specifically those policies for which management is required to exercise discretion or judgment regarding the implementation thereof).

• Review with management its evaluation of Citigroup's internal control structure and procedures for financial reporting and review periodically, but in no event less frequently than quarterly, management's conclusions about the efficacy of such internal controls and procedures, including any significant deficiencies or material weaknesses in such controls and procedures.

• Annually review and discuss with management and the independent Auditors (1) Management's assessment of the effectiveness of Citigroup's internal control structure and procedures for financial reporting and (2) the independent auditors' report on the effectiveness of Citigroup's internal control over financial reporting related to Section 404 of the Sarbanes-Oxley Act of 2002.

• Annually review and approve management's evaluation of the effectiveness of the bank's advanced systems for the calculation of risk-based capital requirements.

• Discuss with management Citigroup's major credit, market, liquidity and operational risk exposures and the steps management has taken to monitor and control such exposures, including Citigroup's risk assessment and risk management policies.

• Establish procedures for the receipt, retention, and treatment of complaints received by Citigroup regarding accounting, internal accounting controls, or auditing matters, and the confidential, anonymous submission by employees of Citigroup of concerns regarding questionable accounting or auditing matters.

Oversight of Citigroup's Relationship with the Independent Auditors

• Receive and discuss a report from the independent auditors at least annually regarding:

> --The independent auditors' internal quality-control procedures;

> --Any material issues raised by the most recent quality-control review, or peer review (if applicable), of the independent auditors, or by any inquiry or investigation by governmental or professional authorities within the preceding five years respecting one or more independent audits carried out by the independent auditors;

> --Any steps taken to deal with any such issues;

> --All relationships between the independent auditors and Citigroup, in order to assess the
> independent auditors' independence; and

> --Key staffing and lead audit partner rotation plans.

• Approve guidelines for the retention of the independent auditors for any non-audit services and determine procedures for the approval of audit, audit-related, tax and other services in advance. In accordance with such procedures, the Committee shall approve in advance any audit, audit-related, tax, and other services provided to Citigroup by the independent auditors. Pre-approval authority may be delegated to one or more members of the Committee.

• Review and discuss the scope and plan of the independent audit.

• Evaluate the qualifications, performance and independence of the independent auditors, including whether the provision of non-audit services is compatible with maintaining the auditors' independence, and taking into account the opinions of management and ARR.

This shall include a review and discussion of the annual communication as to independence delivered by the independent auditors (Independence Standards Board Standard No. 1 — "Independence Discussions with Audit and Risk Management Committees"). The Committee shall present its conclusions to the Board, and if so determined by the Committee, recommend that the Board take additional action to satisfy itself of the qualifications, performance and independence of the auditors.

• Recommend to the Board policies for Citigroup's hiring of employees or former employees of the independent auditors.

Oversight of Audit and Risk Review

• Review and approve the appointment and replacement of the Chief Auditor who shall report directly to the Committee.

• Review and discuss the ARR findings that have been reported to management, management's responses, and the progress of the related corrective action plans.

• Review and evaluate the adequacy of the work performed by the Chief Auditor and ARR, and ensure that ARR is independent and has adequate resources to fulfill its duties, including implementation of the annual audit plan.

Compliance Oversight Responsibilities

• Review periodically with management, including the Citigroup chief risk officer, the chief compliance officer and the general counsel, and the independent auditors, any correspondence with, or other action by, regulators or governmental agencies, any material legal affairs of Citigroup and Citigroup's compliance with applicable law and listing standards.

• Review and discuss the report of the Chief Auditor regarding the expenses of, the perquisites paid to, and the conflicts of interest, if any, of members of Citigroup's senior management.

• Receive and discuss reports from management on an annual and/or as needed basis relating to: compliance at Citigroup (including anti-money laundering, regulatory and fiduciary compliance); significant reported ethics violations; compliance with regulatory internal control and compliance reporting requirements; compliance with OCC Bulletin 97-23 (business resumption and contingency planning); tax

developments and issues; fraud and operating losses; technology and information security; and Citigroup and subsidiaries' insurance.

140.    Pursuant to its Charter, the Nomination and Corporate Governance Committee had

the following duties and responsibilities:

• Review and assess the adequacy of the Company's policies and practices on corporate governance including the Corporate Governance Guidelines of the Company and recommend any proposed changes to the Board for approval.

• Review and assess the adequacy of the Company's Code of Conduct, the Code of Ethics for Financial Professionals and other internal policies and guidelines and monitor that the principles described therein are being incorporated into the Company's culture and business practices.

• Review requests for any waiver of the Company's Code of Conduct and recommend to the Board whether a particular waiver should be granted.

• Review the Company's business practices, particularly as they relate to preserving the good reputation of the Company. The Company's internal Business Practices Committee shall provide reports to the Committee or to the Board at least annually. The Chair of the Business Practices Committee shall be invited to attend meetings of the Committee, at the request of the Chair of the Committee.

• Review the appropriateness of the size of the Board relative to its various responsibilities. Review the overall composition of the Board, taking into consideration such factors as business experience and specific areas of expertise of each Board member, and make recommendations to the Board as necessary.

• In consultation with the Board and the CEO, either the Committee as a whole or a subcommittee thereof shall, as part of its executive succession planning process, evaluate and nominate potential successors to the CEO. The Committee will also provide an annual report to the Board on CEO succession.

• Develop appropriate criteria and make recommendations to the Board regarding the independence of directors and nominees.

• Recommend to the Board the number, identity and responsibilities of Board committees and the Chair and members of each committee. This shall include advising the Board on committee appointments and removal from committees or from the Board, rotation of committee members and Chairs and committee structure and operations.

• Review the adequacy of the charters adopted by each committee of the Board, and recommend changes as necessary.

• Assist the Board in developing criteria for identifying and selecting qualified individuals who may be nominated for election to the Board, which shall reflect at a minimum all applicable laws, rules, regulations and listing standards.

• Recommend to the Board the slate of nominees for election to the Board at the Company's annual meeting of stockholders.

• As the need arises to fill vacancies, actively seek individuals qualified to become Board members for recommendation to the Board.

• Consider nominations for Board membership recommended by security holders.

• Periodically review and recommend to the Board the compensation structure for non-employee directors for Board and committee service.

• Periodically assess the effectiveness of the Board of Directors in meeting its responsibilities, representing the long-term interests of stockholders.

• Report annually to the Board with an assessment of the Board's performance.

• Review adherence by directors to corporate guidelines regarding transactions with the Company and insure that the Transaction Review Committee reports to the Committee on any transaction it reviews.

• Monitor the orientation and continuing education programs for directors.

• Conduct an annual review of the Committee's performance and report the results to the Board, periodically assess the adequacy of its charter and recommend changes to the Board as needed.

• Regularly report to the Board on the Committee's activities.

• Obtain advice and assistance, as needed, from internal or external legal counsel, accounting firms, search firms or other advisors, with the sole authority to retain, terminate and negotiate the terms and conditions of the assignment.

• Delegate responsibility to subcommittees of the Committee as necessary or appropriate.

• Perform any other duties or responsibilities expressly delegated to the Committee by the Board from time to time.

141.  Pursuant to its Charter, the Personnel an Compensation Committee had the following duties and responsibilities:

• Annually review and approve corporate goals and objectives relevant to the Office of the Chairman and the Chief Executive Officer ("CEO") compensation, evaluate the Chairman's and the CEO's performance in light of these goals and objectives, and provide a report thereon to the Board.

• Annually review and determine, reflecting the advice of an independent compensation consultant, base salary, incentive compensation and long-term compensation for the Chairman and the CEO, and report the Committee's determination to the Board. In determining long-term incentive compensation of the Chairman and the CEO, the Committee shall consider, among other factors, the Company's performance, the individual's performance, relative stockholder return, the value of similar incentive awards to individuals at these positions at comparable companies and, if appropriate, the awards given to the Chairman and the CEO in past years.

• Annually review and approve, reflecting the advice of an independent compensation consultant, base salary, incentive compensation and long-term incentive compensation for senior management.

• Annually review and discuss the Compensation Discussion and Analysis with management, and, if appropriate, recommend to the Board that the Compensation Discussion and Analysis be included in the Company's filings with the Securities and Exchange Commission.

• Prepare an annual report for inclusion in the Company's proxy statement.

• Review executive officer compensation for compliance with Section 16 of the Securities Exchange Act and Section 162(m) of the Internal Revenue Code, as each may be amended from time to time, and, if appropriate, any other applicable laws, rules and regulations.

• In consultation with the CEO, review the talent development process within the Company to ensure it is effectively managed. Senior management will provide a report to the Committee regarding its talent and performance review process for key Operating Committee members and other high potential individuals.

The purpose of the performance and talent review is to ensure that there is a sufficient pool of qualified internal candidates to fill senior and leadership positions and to identify opportunities, performance gaps and next steps as part of the

Company's executive succession planning and development process, all of which shall be reviewed with the Committee.

• Annually review employee compensation strategies, benefits and equity programs.

• Review and approve employment agreements, severance arrangements and change in control agreements and provisions when, and if, appropriate, as well as any special supplemental benefits.

• Annually review, in conjunction with the Public Affairs Committee, the Company's progress in meeting diversity goals with respect to the employee population.

• Conduct an annual review of the Committee's performance, periodically assess the adequacy of its charter and recommend changes to the Board as needed.

• Regularly report to the Board on the Committee's activities.

• Obtain advice and assistance, as needed, from internal or external legal counsel, accounting firms, search firms, compensation specialists or other advisors, with the sole authority to retain, terminate and negotiate the terms and conditions of the assignment.

• Delegate responsibility to subcommittees of the Committee as necessary or appropriate.

• Perform any other duties or responsibilities expressly delegated to the Committee by the Board from time to time.

142.    Pursuant to its Charter, the Public Affairs Committee had the following duties and responsibilities:

• Review the state of the Company's relationships with external constituencies, how those constituencies view the Company and the issues raised by them.
• Review the public policy and reputation issues facing Citi.

• Review political contributions made by the Company and charitable contributions made by the Company and the Citi Foundation.

• Review Community Reinvestment Act performance and compliance with fair lending practices.

• Review shareholder proposals, management responses and other shareholder activism issues.

• Review the Company's policies and practices regarding supplier diversity.

• Review the Company's sustainability policies and programs, including the environment and human rights.

• Conduct an annual review of the Committee's performance and report the results to the Board, periodically assess the adequacy of its charter and recommend changes to the Board as needed.

• Regularly report to the Board on the Committee's activities.

• Obtain advice and assistance, as needed, from internal or external legal counsel, or other advisors, with the sole authority to retain, terminate and negotiate the terms and conditions of the assignment.

• Delegate responsibility to subcommittees of the Committee as necessary or appropriate.

• Perform any other duties or responsibilities expressly delegated to the Committee by the Board from time to time.

143.   Finally, Defendants were responsible for maintaining and establishing adequate internal accounting controls for the Company and to ensure that the Company's financial statements were based on accurate financial information.   According to Generally Accepted Accounting Principles ("GAAP"), to accomplish the objectives of accurately recording, processing, summarizing, and reporting financial data, a corporation must establish an internal accounting control structure.   Among other things, this required Defendants to:  (a) make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and (b) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurance that: (i) transactions are executed in accordance with management's general or specific authorization; and (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

144.    At all relevant times, as a result of their membership in the Board, various Committees of the Board, and/or senior management of the Company, as well as the powers available to each of them as a result of these memberships, the Defendants each had access to internal corporate documents, conversations, and connections with other corporate officers and employees, attended management and Board meetings, and committees thereof, and was provided with reports and other information about the Company prior to their public dissemination.

145.    Accordingly, and because of their positions of trust, loyalty, and fidelity to Citi, Defendants knew or should have known: (a) the adverse, material information about the business of Citi that they failed to disclose to the investing public, which subjected the Company to lawsuits by and ultimately huge damages paid to shareholders; (b) the true state of affairs at Citi as to which they caused the Company to affirmatively offer false and misleading guidance to investors (including the dissemination of false press releases and false filings with the SEC throughout the Relevant Period; (c) the nature of their fiduciary duties to Citi, including the elaborate, duties that the Company required of them, and their active breach of those very same duties; (d) the absence of any meaningful internal controls and procedures that would have prevented the Defendants' manipulation of the market for ARS, their deception of its own customers, and the Company's resulting exposure to government investigations, lawsuits, and the need to repurchase or otherwise carry tens of billions of dollars of essentially worthless ARS on its books; (e) the waste of Company assets represented by Citi's decision to pay Defendants lavish salaries, bonuses, and other compensation even though they had exposed the Company to tens of billions of dollars in settlements, ARS repurchases, and other liabilities; and (f) the conflicts of interests among

themselves which caused Defendants to act in their own self-interest and contrary to the interests of Citi.

146.     At all relevant times, the Defendants individually and collectively engaged in a course of conduct that was consciously designed to and did:  (a) enhance the Defendants' directorial and managerial positions at Citi, as well as the power and prestige accruing to Defendants as a result of holding those positions, and transfer exorbitant unearned and wasteful sums of money to themselves; (b) expose Citi to a liability for Defendants' conscious manipulation of the ARS market, their deception of Company customers, and their exposure of the Company to government investigations, lawsuits, and the need to repurchase or otherwise carry tens of billions of dollars of essentially worthless ARS on its books; (c) conceal the fact that the Company was grossly misrepresenting its financial results in order to allow Defendants to conceal the Company's liability arising from the manipulation of the ARS market at least long enough to allow certain Defendants to pay themselves enormous bonuses for 2007, and all Defendants' substantial bonuses and other compensation; and (d) otherwise deceive the investing public, including Citi's own shareholders, as to the Defendants' management of Citi's operations, the Company's financial health, stability, the accuracy and integrity of its accounting policies and other internal controls, and its and business prospects, exposing the Company to massive damages and incalculable reputational loss among its actual and potential customers and investors.

147.     In committing the wrongful acts alleged herein, Defendants pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein

alleged as giving rise to primary liability, Defendants further aided, abetted, and/or assisted one another in breaching their respective duties.

148.    At all relevant times, each of the Defendants was the agent of each of the other Defendants, and was at all times acting within the course and scope of such agency.

149.    Each of the Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of the wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

150.    Defendants engaged in a conspiracy, common enterprise and/or common course of conduct commencing on July 20, 2007 and continuing thereafter regarding the ARS market, as well as the Company's financial statements and other statements regarding Citi's performance and financial condition. During this time, Defendants caused Citi to conceal the true fact that defendants had caused the Company to misrepresent its financial results, deceive customers and shareholders, manipulate the ARS market, and expose the Company to government investigations, lawsuits, and the need to repurchase or otherwise carry tens of billions of dollars of essentially worthless ARS on its books. In addition, Defendants also made specific, improper statements about Citi's financial performance, and its future business prospects throughout the Relevant Period.

151.    The purpose and effect of Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise Defendants' violations of federal and state law, breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment; to conceal adverse information concerning the Company's operations,

financial condition and future business prospects; and to artificially inflate the price of Citi common stock so they could, among other things: (i) usurp tens of millions of dollars in unearned bonus, salaries, stock awards, and other emoluments, and (ii) protect and enhance defendants' executive and directorial positions and the substantial compensation and prestige they obtained as a result thereof.

## CLAIMS FOR RELIEF

### COUNT I

### Against All Defendants for Breach of Fiduciary Duties

152.    The Retirement System incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

153.    Defendants owed and owe Citi fiduciary obligations.  By reason of their fiduciary relationships, the Officer Defendants and the Director Defendants owed and owe Citi the highest obligation of good faith, fair dealing, loyalty, oversight, and due care.

154.    Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.  Each of the Defendants had actual or constructive knowledge that Defendants had caused the Company to manipulate the market for ARS, deceive its own customers, become exposed to government investigations, lawsuits, and the need to repurchase or otherwise carry tens of billions of dollars of essentially worthless ARS on its books, and mislead shareholders.

155.    Defendants consciously failed to implement an effective system of internal controls over its ARS marketing and trading operations and/or consciously failed to oversee the operations of such control systems.

156.    Defendants knowingly caused or allowed the Company's financial statements to be materially misstated due to Defendants' knowing pretense that the market for ARS was liquid.

157.    Defendants failed in good faith to supervise, and to exert internal controls over, and consciously disregarded responsibilities involving the Company's trading and marketing operations of ARS securities.

158.    Defendants also knowingly caused Citi's financial statements during the Relevant Period to be materially misleading and not prepared in accordance with GAAP principles.

159.    As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, Citi has sustained significant damages.  As a result of the misconduct alleged herein, each of the Defendants is liable to the Company.

160.    The Retirement System on behalf of Citi has no adequate remedy at law.

## COUNT II

### Against the Insider Selling Defendants for Breach of Fiduciary Duties

161.    The Retirement System incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

162.    At the time of each of the stock sales set forth herein, each of the Insider Selling Defendants knew, but did not disclose publicly, the material information described herein.  Each of the Insider Selling Defendants made each of his or her sales of stock between July 20, 2007 and the present on the basis of and because of his or her knowledge of this material, non-public information.

163.    At the time of their stock sales, each of the Insider Selling Defendants knew that when the material information described herein was publicly disclosed, the price of the Company's stock would dramatically decrease.  These defendants' sales of Citi common stock based on their

knowledge of the material, non-public information was a breach of their fiduciary duties of loyalty and good faith.

164.    As a result of this misconduct, the Insider Selling Defendants are liable to the Company.  The Company is entitled to have a constructive trust imposed on any proceeds obtained by these defendants obtained thereby.

165.    The Retirement System on behalf of Citi has no adequate remedy at law.

## COUNT III

### Against All Defendants for Abuse of Control

166.    The Retirement System incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

167.    Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Citi, for which they are legally responsible. Among these abuses of control were:

(i)    Defendants' failure to in good faith supervise and exert internal controls over, and their conscious disregard of responsibilities involving the Company's operations in the trading and marketing of ARS securities, and their knowing failure to disclose the true accounting, operational and financial condition of the Company;

(ii)    Defendants' knowingly causing or allowing Citi to prepare and publish financial statements that were materially misstated due to defendants' concealment of the illiquid market for ARS and the Company's exposure to government investigations, lawsuits, and the need to repurchase or otherwise carry tens of billions of dollars of essentially worthless ARS on its books; and

(iii)    Defendants' knowingly causing, allowing and/or arranging the payment of tens of millions of dollars more in improper salaries, bonuses, and other compensation – and to award themselves lucrative new compensation packages – at a time when, as a direct and foreseeable consequence of their wrongdoing, the Company was exposed to tens of billions of dollars in losses;

168.    As a direct and proximate result of Defendants' abuse of control, Citi has sustained significant damages.

169.    As a result of the misconduct alleged herein, Defendants are liable to the Company.

170.    The Retirement System on behalf of Citi has no adequate remedy at law.

## COUNT IV

### Against All Defendants for Gross Mismanagement

171.    The Retirement System incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

172.    By their actions alleged herein, Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Citi in a manner consistent with the operations of a publicly held corporation.

173.    Defendants caused or allowed Citi to lack requisite internal controls, and as a result, the Company's projections and reported results were based upon defective assumptions and/or manipulated facts.

174.    Defendants caused or allowed the Company's financial statements to be materially misstated due to Defendants' knowing failure to prevent Citi's manipulation of the market for ARS,

its deception of its own customers, and its resulting exposure to government investigations, lawsuits, and the need to repurchase or otherwise carry tens of billions of dollars of essentially worthless ARS on its books.

175.    Based on the foregoing, Defendants caused or allowed Citi's financial statements to be materially misleading and not prepared in accordance with GAAP principles during the Relevant Period.

176.    As a direct and proximate result of Defendants' gross mismanagement and breaches of fiduciary duty alleged herein, Citi has sustained significant damages in excess of hundreds of millions of dollars. In fact, Citi's market capitalization was reduced by *tens of billions of dollars* during the Relevant Period and especially during the last few months alone.

177.    As a result of the misconduct and breaches of duty alleged herein, Defendants are liable to the Company.

178.    The Retirement System on behalf of Citi has no adequate remedy at law.

### COUNT V

**Derivatively Against All Defendants for Violation of § 10(b)
of the Exchange Act and Rule 10b-5 Promulgated Thereunder**

179.    The Retirement System incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

180.    Throughout the Relevant Period, Defendants, by the use of means or instrumentalities of interstate commerce, the United States mails, interstate telephone communications, and a national securities exchange, employed a device, scheme, or artifice to defraud, made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading, and engaged in acts, practices,

and a course of business which operated as a fraud and deceit upon the Company and shareholders in connection with their purchases of Citi during the Relevant Period, all in violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

181.    Defendants, as the most senior officers and/or members of the Board of Directors of Citi and various Committees of the Board during the Relevant Period, are liable as direct participants in all of the wrongs complained of herein.  Through their positions of control and authority, Defendants were in a position to and did control all of the false and misleading statements and omissions made on behalf of the Company, including the contents of all its public filings and reports and press releases, as more particularly set forth above.  In addition, certain of these false and misleading statements constitute "group published information," which Defendants were responsible for creating.

182.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them and they had express responsibility for knowing such facts.  Such material misrepresentations and omissions were made knowingly or recklessly and for the purpose and effect of concealing the Company's true financial and operating condition from shareholders and supporting an artificially inflated price of the Company's common stock.

183.    Defendants had the motive and opportunity to commit fraud.  By virtue of their positions of control over the entire management of the Company, the Director Defendants had unquestioned opportunity to issue statements that they knew were false and misleading.  Each of the

Officer Defendants had direct operative control over the Company's investments in subprime mortgage assets.  Each of the Defendants had the motive to mislead investors as to the Company's true exposure to these instruments, because, among other things:

(a)    During the Relevant Period, each of the Officer Defendants wanted to paint a picture of Citi as being as profitable as possible so as to ensure the maximum possible bonus and other performance-based compensation for the fiscal year; accordingly, each of these Defendants was motivated to conceal the Company's true exposure to losses in the subprime credit market;

(b)    In particular, each of the Officer Defendants received significant compensation including a program of bonuses when Citi reached certain financial and earnings targets.  The target bonuses rewarded executives on a variety of factors, including the profitability of the Company's operations in the trading and marketing of ARS.  The Officer Defendants, therefore, understood that announcing that Citi stood to lose billions of dollars from revelation that the ARS market was not liquid, and that the Company had manipulated the market to deceive its own customers on that topic, would directly and negatively impact their bonuses;

(c)    Defendants further benefited from high stock prices for Citi when they sold the stock they received through stock, option, and other awards.  As set forth *supra*, since July 20, 2007, Defendants sold millions of dollars worth of Company stock.  If Defendants had caused the Company to report losses in a timely manner, the stock price would have fallen and the amount of money Defendants received from their stock price correspondingly would have decreased by 50 percent or more;

(d)    In addition, each of the Defendants, by virtue of being a shareholder of Citi, was motivated to conceal the Company's exposure to losses and other liabilities in the ARS market as a result of the illiquidity of that market and Defendants' manipulation thereof so as to maintain an artificially high price for the Company's stock;

(e)    Defendants were motivated to overstate Citi's financial results, and keep its stock price high, so as to protect their positions of power, authority, prestige, and personal remuneration at the Company, including out-sized salaries, directors' fees, stock awards, and other emoluments worth multiple millions of dollars to underlined each Defendant and to some, *tens of millions of dollars*.

184.    In purchasing its stock, the Company or its shareholders relied upon the Defendants' statements and/or the integrity of the market in making their purchases.

185.    Accordingly, Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 thereunder in that they:

(a)    employed devices, schemes and artifices to defraud;

(b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c)    engaged in acts, practices and a course of business that operated as a fraud or deceit upon Citi and others in connection with their purchases of Citi common stock during the Relevant Period.

186.    As a result of Defendants' misconduct, Citi has suffered and will suffer damages in that it paid artificially inflated prices for Citi common stock purchased on the open market. Citi

would not have purchased Citi common stock at the prices it paid had the market been aware that the market price of Citi's stock was artificially and falsely inflated by Defendants' misleading statements. As a direct and proximate result of these defendants' wrongful conduct, Citi suffered damages in connection with its purchases of Citi common stock during the relevant period.  By reason of such conduct, Defendants are liable to the Company.

187.    The Retirement System on behalf of Citi has no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, the Retirement System demands judgment as follows:

A.    Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment, and violations of federal law;

B.    Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting Defendants' assets until the Company can recoup all of the monies improperly transferred to Defendants, and the proceeds to the Insider Selling Defendants from their sales of Company common stock based on material, non-public information, so as to assure that the Retirement System on behalf of Citi has an effective remedy;

C.    Declaring that the Defendants are liable under of § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and awarding Citi damages;

D.    Declaring that Defendants' improper payments to themselves through the Company's coffers of unearned bonuses, compensation, stock awards, fees, and other illicit transfers

– as well as any assets or property acquired with such payments – be held in constructive trust for the Company's benefit;

      E.      Awarding to Citi restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other monies obtained by Defendants;

      F.      Directing Citi to take all necessary actions to reform and improve their corporate governance and internal procedures to comply with applicable laws and to protect Citi and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

      (i)      strengthening the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

      (ii)      controlling and limiting improper payments of unearned compensation, corporate benefits, stock awards, and other emoluments;

      (iii)      permitting shareholders of Citi to nominate at least three candidates for election to the Board;

      (iv)      appropriately testing and then strengthening the internal audit and control functions demanded herein;

      (v)      replacing completely the current memberships of the Audit and Risk Committee, the Personnel and Compensation Committee, and the Nominating and Corporate Governance Committee;

(vi)     establishing enhanced minimum qualifications for members of the Audit and Risk Committee, the Personnel and Compensation Committee, and the Nominating and Corporate Governance Committee;

(vii)    establishing a Committee of the Board charged with monitoring and minimizing the risk to the Company from its activities in various types of derivative securities, such as ARS, whose volatility or liquidity might create financial issues for the Company, its trading partners, or its customers, or damage its reputation; and

(viii)   preventing the Company from underwriting or selling any new derivative securities without adequate safeguards that such securities will trade in a liquid markets without the need for supportive or manipulative activities by the Company that violate Company policies, ethical norms, industry standards, or federal or state securities laws;

G.     Awarding the Retirement System the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses;

H.     Granting such other and further relief as the Court deems just and proper

## JURY DEMAND

The Retirement System demands a trial by jury.

Dated:  August 19, 2008

KAHN GAUTHIER SWICK, LLC

_____

Lewis S. Kahn
Albert M. Myers (AM-2750)
Kevin Oufnac
650 Poydras Street, Suite 2150
New Orleans, LA 70130
Telephone: (504) 455-1400
Facsimile:  (504) 455-1498

Michael Swick (MS-9970)
12 East 41st Street—12th Floor
New York, NY 10017
Telephone: (212) 696-3730
Facsimile:  (504) 455-1498

*Attorneys for Plaintiff the Louisiana Municipal Employees Retirement System*

## VERIFICATION

I, Kathy Bourque, am the Director of the Louisiana Municipal Police Employees' Retirement System (MPERS). I declare that I have reviewed the Shareholder's Derivative Complaint in the case captioned *Louisiana Municipal Police Employees' Retirement System v. Vikram Pandit, et. al.*, S.D.N.Y., and I authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason I believe them to be true. I further declare that MPERS is a current owner of Citigroup, Inc. common stock and have been an owner of such stock from July 2006 to the present.

August  _15_ , 2008.

_____

Kathy Bourque
Director, Louisiana Municipal Police Employee's Retirement System
7722 Office Park Blvd., Suite 200
Baton Rouge, LA 70809