UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

LOUISIANA MUNICIPAL POLICE
EMPLOYEES RETIREMENT SYSTEM,

        Plaintiff,

    -v-                                No.  08 Civ. 7389 (LTS)(RLE)

VIKRAM PANDIT, <u>et al.</u>,

        Defendants.

-------------------------------------------------------x

### OPINION AND ORDER

APPEARANCES:

KAHN SWICK & FOTI, LLC
  By:  Albert Morris Myers, III, Esq.
       Kevin L. Oufnac, Esq.
       Lewis Stephen Kahn, Esq.
       Michael Andrew Swick, Esq.
650 Poydras St., Suite 2150
New Orleans, LA 70130

*Attorneys for Plaintiff*

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON, LLP
  By:  Brad Scott Karp, Esq.
       Susanna Michele Buergel, Esq.
1285 Avenue of the Americas
New York, NY 10019
      - and -
  By: Charles Edward Davidow, Esq.
2001 K Street, N.W., 5th Floor
Washington , DC 20006

*Attorneys for Defendants*

LAURA TAYLOR SWAIN, United States District Judge

Plaintiff Louisiana Municipal Police Employees Retirement System ("Plaintiff" or "Louisiana Municipal") brings this derivative action on behalf of Citigroup, Inc. ("Citigroup" or the "Company"), a Delaware corporation, against individual Citigroup directors and officers, the former Chief Executive Officer of Citigroup, and, nominally, Citigroup (collectively, "Defendants"), for breach of fiduciary duty, abuse of control, gross mismanagement, and violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder, in connection with the Company's involvement in the auction-rate securities ("ARS") market.  Defendants move to dismiss Plaintiff's complaint (the "Complaint") pursuant to Federal Rules of Civil Procedure 12(b)(6) and 23.1, on the ground that Plaintiff failed to make a demand on the Company's board prior to bringing this derivative action and that Plaintiff has failed to plead with particularity why such demand would have been futile.  The Court has considered carefully all of the parties' authorized submissions.  (See Docket Entry No. 41.)  The Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331.

## BACKGROUND

The following facts are taken from the Complaint unless otherwise noted.[1]  Plaintiff,

----

[1]     Plaintiff asks the Court in a letter dated, January 12, 2009, to take judicial notice of the existence and content of an SEC complaint filed in Securities and Exchange Commission v. Citigroup Global Markets, Inc., No. 08 Civ. 10753, arguing that the complaint in that action makes public for the first time additional allegations concerning the involvement by senior management of the Company in the underlying misconduct in the ARS market.  (See Docket Entry Nos.26-27.)  Plaintiff also asks the Court to take judicial notice of the existence and content of a complaint filed in the Southern District of Florida in Ocwen Financial Corporation, et al. v. Citigroup Global Markets, Inc., No. 09 Civ. 80397, and of an "Assurance of Discontinuance" entered into with the New York Attorney General in August 2008. (See Docket Entry No. 34.)  For substantially the reasons stated in Defendants' January 13, 2009, letter, specifically that judicial notice of allegations in separate proceedings is not appropriate when assessing the sufficiency of a complaint, particularly as the demand futility question at issue here turns on the state of

an owner and holder of Citigroup common stock during the relevant period, alleges that Defendants

engaged in a scheme to manipulate the ARS market that has cost the Company tens of billions of

dollars and has permanently tarnished the Company's reputation.

ARS Practices

ARS are securities without a fixed rate of return, whose rates of return are

periodically reset through an auction process.  (Compl. ¶ 59.)  One or more broker-dealers, selected

by the issuer, underwrite the offering and/or manage the auction process.  (Id. at ¶ 65.)  Citigroup

was one of the largest broker-dealers participating in the ARS market.  (Id.)  By 2006, the ARS

market had grown to more than $200 billion annually, and the fees collected by the approximately

ten broker-dealers dominating the market exceeded $660 million annually.  (Id. at ¶ 72.)

According to the Complaint, the success of the ARS market at Citigroup depended

on the perception that the market was extremely liquid.  (Id. at ¶ 73.)  In order to conceal the

inherent illiquidity in the market, Defendants caused the Company to engage in market

manipulation.  (Id. at ¶ 75.)  Specifically, broker-dealers such as Citigroup routinely took over their

customers' bid orders after viewing other bidders' orders, bid for their own accounts without

disclosing such bidding to customers, and asked customers to change their orders.  (Id. at ¶ 77.)

Broker-dealers also changed or prioritized customers' bids before submitting them to the auction

agent and allowed submission or revision of bids after external and internal deadlines had elapsed.

(Id. at ¶¶ 79-80.)   Broker-dealers collaborated with certain customers by asking them to bid in

---

Defendants' knowledge and potential liability exposure as of the time that Plaintiff's
complaint was filed, the Court declines to take judicial notice of the additional
submissions.  (See Docket Entry No. 28.)

auctions and compensating them at higher rates in the secondary market.  (Id. at ¶ 81.)  Certain broker-dealers would provide different estimates of the likely range at which an auction would clear to different customers.  (Id. at ¶ 82.)  Broker-dealers, thus, were able to manipulate the clearing rate of the auctions, prevent failed auctions and set artificial "market" rates at levels that the broker-dealers themselves essentially dictated.  (Id. at ¶¶ 77-78.)

As a result of the foregoing practices, the Securities and Exchange Commission (the "SEC") fined fifteen broker-dealers, including Citigroup, $13 million, censured the broker-dealers and ordered them to cease and desist from these practices.  (Id. at ¶ 83.)  Citigoup subsequently agreed to pay an additional $200,000 in fines on behalf of one of its affiliates.  (Id. at ¶ 85.)

Defendants also caused the Company to make misrepresentations and omissions about the ARS market, Defendants' manipulation of that market, and the Company's financial condition, in Citigroup's announced quarterly and full year results, and Forms 10-K and 10-Q.  (Id. at ¶¶ 103-15.)

According to the Complaint, despite the fines and the cease-and-desist orders, Defendants knowingly caused Citigroup to continue to engage in practices intended to bolster the auction market artificially, thereby exposing the Company to greatly enhanced criminal and civil liability.  (Id. at ¶ 85.)  Plaintiff alleges that, as the demand for ARS from the Company's corporate and institutional clients essentially dried up, Citigroup was left with more ARS inventory on its books than it could handle financially.  (Id. at ¶¶ 87-88.)  In an attempt to unload millions of dollars of Citigroup ARS inventory, Defendants caused Citigroup to market ARS to customers even more intensely as a liquid cash alternative investment.  (Id. at ¶¶ 90-91.)  By August 16, 2007, several monthly auctions had failed and thereafter auctions began failing regularly.  (Id. at ¶¶ 92-93.)  Those auctions that succeeded would have failed but for the intervention of the broker-dealers.  (Id.

at ¶ 93.)  Defendants caused Citigroup to continue to intervene to prop up the auctions and then, having unloaded as many ARS as possible from Citigroup's inventory, Defendants directed the Company to stop supporting auctions and walk away from the market.  (Id. at ¶¶ 93, 95.) Thousands of investors holding millions of dollars of ARS purchased from Citigroup were left with highly illiquid, essentially worthless, investments.  (Id.)

Following the failure of the ARS markets, class actions and formal investigations were initiated.  (Id. at ¶ 96.)  Less than one week after the New York Attorney General announced that his office intended to file charges against the Company concerning fraudulent marketing of ARS to investors, Defendants announced that they had caused the Company to settle the Attorney General's charges, as well as the SEC's formal order of investigation.  (Id. at ¶¶ 97-98.)  This settlement requires the Company to maintain inventories of now drastically diminished or worthless ARS in the par amount of over $15 billion and does not preclude further investor lawsuits.  (Id. at ¶¶ 100-101.)  Additionally, the Company has been required to raise at least $30 billion in new capital since November 2007 and has posted over $16 billion in write-downs for the first quarter of 2008.  (Id. at ¶ 102.)  Plaintiff alleges, thus, that Defendants' conduct has resulted in harm to the Company, including exposure to tens of billions of dollars in losses, settlements, damages and other liability that it would not have otherwise been exposed to, and an irremediable harm to its reputation resulting from formal investigations by state and federal authorities.  (Compl. ¶ 13.)

### Citigroup's Board of Directors

As of August 20, 2008, the date that the Complaint was filed, fifteen individuals served on the Company's Board of Directors (the "Board"): Vikram Pandit ("Pandit"), C. Michael Armstrong ("Armstrong"), Alain J.P. Belda ("Belda"), Sir Winfried Bischoff (" Bischoff"),

Kenneth T. Derr ("Derr"), John M. Deutch ("Deutch"), Roberto Hernandez Ramirez ("Hernandez"), Andrew N. Liveris ("Liveris"), Anne M. Mulcahy ("Mulcahy"), Richard D. Parsons ("Parsons"), Lawrence Ricciardi ("Ricciardi"), Judith Rodin ("Rodin"), Robert E. Rubin ("Rubin"), Robert L. Ryan ("Ryan"), and Franklin A. Thomas ("Thomas") (collectively, the "August 2008 Directors").[2]  (Compl. ¶¶ 21-35.)  Pandit was the Chief Executive Officer of Citigroup.  (Id. at ¶ 21.)  Bischoff and Rubin also hold executive positions at the Company.  (Id. at ¶ 24; Def's Mem. at 6, n. 4.)  According to the Complaint, Hernandez holds 14.6 million shares of Citigroup and received nearly $3 million in bonuses and other compensation in 2007.  (Id. at ¶¶ 27, 55(a).)  Plaintiff asserts that, in a 2008 proxy statement, Citigroup conceded that Bischoff, Hernandez, Pandit and Rubin are not independent directors.  (Id. at ¶ 55(c).)

Plaintiff alleges that Derr and Thomas have sat on the Board for a combined 57 years, that six of the August 2008 Directors sit on the Audit and Risk Oversight Committee, and that five of the August 2008 Directors play disproportionately large roles in the governance of the Company because they sit on a majority of committees.  (Id. at ¶¶ 55(b), (d), (h).)  Plaintiff alleges that Bischoff has spent a quarter of a century in high-level executive positions and controls the compensation and other benefits that the other directors receive, as well as what roles they play in

---

[2]      Also named as individual defendants are Charles Prince, the Chief Executive Officer of Citigroup until October 2007; Gary Crittenden, the Chief Financial Officer of Citigroup; Hamid Biglari, the Chief Operating Officer, Institutional Clients Group, of Citigroup; Raymond McGuire, co-head, Global Investment Banking, Institutional Clients Group, of Citigroup; Cindy Armine, Chief Compliance Officer of Citigroup; Stephen Volk, the Vice Chairman of Citigroup; John Havens, the Chief Executive Officer, Institutional Clients Group, of Citigroup; Bonnie Howard, the Chief Auditor of Citigroup; Lewis B. Kaden, the Vice Chairman of Citigroup; Brian Leach, the Chief Risk Officer of Citigroup; Richard C.S. Evans, the Chief Risk Officer, Institutional Clients Group, of Citigroup; James A. Forese, the Head, Global Capital Markets, Markets and Banking, Institutional Client Group, of Citigroup; and John Gerspach, the Controller and Chief Accounting Officer of Citigroup.

governance.  (Id. at ¶ 55(f).)

      Two of the August 2008 Directors, Bischoff and Rubin, sold Company stock since July 20, 2007, allegedly while in possession of material, non-public information regarding the Company's exposure to losses, settlements and liability in the ARS market.  (Id. at ¶ 55(g).)  The August 2008 Director Defendants received hundreds of thousands of dollars per year in compensation, and the compensation of Pandit, Bischoff and Hernandez ranges in the millions.  (Id. at ¶ 137(b).)  Plaintiff further alleges that wrongdoers continue to dominate and control the Board, that the acts complained of are violations of the board members' fiduciary duties, and are illegal and improper (and therefore incapable of ratification), and that the Company's directors' and officers' liability insurance policies for the relevant period have an "insured vs. insured" exclusion. (Id. at ¶¶ 135(a)-(c), (f).)[3]  To bring an action for breach of fiduciary duties, the 2008 August Directors would have had to sue themselves and/or fellow directors and top-ranking Company officials.  (Id. at ¶ 135(d).)  Plaintiff also alleges that, as members of the various committees, the August 20, 2008 Directors breached important specific duties outlined in the relevant committee charters by failing to prevent the Company's manipulation of the ARS market.  (Id. at ¶¶ 137(c)-(g).)

      For these and other reasons Plaintiff, which did not make a demand of the Board prior to initiating this litigation, asserts that it would have been futile to do so.

---

[3]    The Complaint includes two paragraphs 135 and 137.  References to those paragraphs in this Opinion refer to the first time those paragraph numbers are used, in the sections beginning on pages 17 and 19 of the Complaint.

<u>D</u>ISCUSSION

Defendants move to dismiss the Complaint pursuant to Rules 12(b)(6) and 23.1 of the Federal Rules of Civil Procedure based on Plaintiff's failure to make a pre-suit demand on the Board.  Plaintiff argues that its Complaint is sufficient to demonstrate that the demand requirement is excused.

<u>Legal Standards</u>

*Rule 12(b)(6)*

In evaluating a motion to dismiss a complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim, the Court accepts as true the non-conclusory factual allegations in the complaint, and draws all reasonable inferences in Plaintiff's favor.  <u>Roth v. Jennings</u>, 489 F.3d 499, 501 (2d Cir. 2007); <u>see</u> <u>also</u> <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937, 1949 (2009).  To survive a motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face."  <u>Bell Atlantic v. Twombly</u>, 550 U.S. 544, 570 (2007).  "A pleading that offers labels and conclusions or a formulaic recitation of elements of a cause of action will not do."  <u>Iqbal</u>, 129 S. Ct. at 1949 (internal quotation marks omitted).  This <u>Twombly</u> standard applies to all civil actions.  <u>Id.</u> at 1953.  Additionally, "[i]n assessing a 12(b)(6) motion in the context of a derivative action, we look to the Federal Rules which set forth the procedural requirements that apply to the pleadings as well as the underlying state substantive law governing the viability of the derivative claims."  <u>Halebian v. Berv</u>, No. 06 Civ. 4099, 2007 WL 2191819, at *4 (S.D.N.Y. July 31, 2007).

*Rule 23.1*

"It is a long held principle of corporate law that directors manage the business of the corporation."  <u>Kernaghan v. Franklin</u>, No. 06 Civ. 1533, 2008 WL 4450268, at *3 (S.D.N.Y. Sept.

29, 2008) (citing Aronson v. Lewis, 473 A.2d 805, 811 (Del.1984), overruled on other grounds by

Brehm v. Eisner, 746 A.2d 244 (Del. 2000)).  "By its very nature the derivative action impinges on

the managerial freedom of directors."  Aronson, 473 A.2d at 811.  Thus, under Federal Rule of

Civil Procedure 23.1, a plaintiff bringing a shareholders' derivative suit must state with

particularity that plaintiff has made a demand on the board of directors to take the requested action

or the reasons for not making the demand. Fed. R. Civ. P. 23.1(b); accord Del. Ch. Ct. R. 23.1.[4]

"Rule 23.1 is not satisfied by conclusory statements or mere notice pleading."  Brehm v. Eisner,

746 A.2d 244, 254 (Del. 2000).  "Because Rule 23.1 requires that Plaintiffs make particularized

allegations, it imposes a pleading standard higher than the normal standard applicable to the

analysis of a pleading challenged under Rule 12(b)(6)."  Kernaghan, 2008 WL 4450268, at *3.


Demand Futility

There are two tests for determining demand futility under Delaware law.  The two-

prong Aronson test applies where a plaintiff is challenging "conscious" board conduct.  Aronson,

473 A.2d at 813.  Such conscious conduct includes a conscious decision to refrain from acting.  Id.

at 813.  Under Aronson, "plaintiffs seeking to establish demand futility must plead particularized

---

[4]    Citigroup is organized and exists under the laws of the State of Delaware.  (Compl.
at ¶ 20.)  Thus, the Court applies Delaware law in determining whether Plaintiff's
pleading satisfies Rule 23.1.  See Louisiana Municipal Police Employees Retirement
System v. Blankfein, No. 08 Civ. 7605, 2009 WL 1422868, at 83, fn. 4 (S.D.N.Y.
May 19, 2009) ("In assessing whether a pleading is adequate for a derivative action
under [Rule] 23.1, courts apply the law of the state of incorporation of the defendant
corporation." (citing Kamen v. Kemper Fin. Servs., 500 U.S. 90, 98-99 (1991))); see
also Scalisi v. Fund Asset Mgmt., L.P., 380 F.3d 133, 138 (2d Cir. 2004) ("The
substantive law which determines whether demand is, in fact, futile is provided by
the state of incorporation of the entity on whose behalf the plaintiff is seeking
relief.").

facts that create a reasonable doubt that 1) the directors are disinterested and independent, or that 2) the challenged transaction was a valid exercise of business judgment."  In re Morgan Stanley Derivative Litigation, 542 F. Supp. 2d 317, 321-22 (S.D.N.Y. 2008) (internal quotation marks and citations omitted).  "The prongs of the Aronson test are in the disjunctive; therefore, if plaintiff creates a reasonable doubt as to either prong of the test, demand is excused."  Kahn v. Portnoy, No. Civ-3515, 2008 WL 5197164, at *9 (Del. Ch. Dec. 11, 2008).  "[F]utility is gauged by the circumstances existing at the commencement of a derivative suit," Aronson, 473 A.2d at 810, and such reasonable doubt "must be raised as to a majority of the board of directors sitting at the time the complaint is filed," In re Morgan Stanley Derivative Litigation, 542 F. Supp. 2d at 322.  The existence of reasonable doubt "must be decided by the trial court on a case-by-case basis" and not by any "rote and inelastic" criteria.  Grobow v. Perot, 539 A.2d 180, 186 (Del. 1988), overruled on other grounds by Brehm v. Eisner, 746 A.2d 244 (Del. 2000).

The single-part Rales test applies "[w]here there is no conscious decision by directors to act or refrain from acting," where the Aronson test would normally be inapplicable.  Rales v. Blasband, 634 A.2d 927, 933 (Del.1993).  The Rales test focuses solely on the first part of the Aronson test – whether plaintiff has alleged particularized facts creating a reasonable doubt that a majority of directors are disinterested and independent – and essentially eliminates the business judgment rule prong of the Aronson test.  Id. at 933-34.  As the Rales court noted "[t]he absence of board action . . . makes it impossible to perform the essential inquiry contemplated by Aronson - whether the directors have acted in conformity with the business judgment rule in approving the challenged transaction."  Id. at 933.

The parties disagree as to the applicable test.  Plaintiff argues that both Aronson and Rales apply and asserts that the Complaint could be construed to allege conscious inaction subject

to the Aronson standard.  Plaintiff, however, has failed to identify any specific matter upon which

the Defendant August 2008 Directors consciously refused to act, and Plaintiff's arguments focus

principally on the Rales issues of independence and disinterestedness.  Defendants argue that only

Rales is applicable in the absence of a challenged business decision.

Here, where no specific decision (active or inactive) of the Board has been identified

and challenged, the Court finds that the Rales standard applies.  See Rales, 643 A.2d at 933 ("The

essential predicate for the Aronson test is the fact that a decision of the board of directors is being

challenged in the derivative suit."); see also In re Citigroup Inc. Shareholder Derivative Litigation,

No. 07 Civ. 9841, 2009 WL 2610746 (S.D.N.Y. Aug. 25, 2009) (applying Rales, over plaintiffs'

objection, where the complaint focused almost entirely on creating a reasonable doubt that the

directors were disinterested and independent and plaintiffs failed to identify any board-approved

transactions, other than a stock repurchase agreement, that they challenged under Aronson's second

prong); Wood v. Baum, 953 A.2d 136, 140 (Del. 2008) ("The second (Rales) test applies where the

subject of a derivative suit is not a business decision of the Board but rather a violation of the

Board's oversight duties."); In re Morgan Stanley Derivative Litigation, 542 F. Supp. 2d 317, 322

(S.D.N.Y. 2008) (applying Rales test because "the isolated and conclusory references to the board's

concealment of, or failure to disclose, [the company's] receipt of the [SEC's] Wells Notice, are

insufficiently particularized to allege a specific board decision to omit the information from the

proxy statement" (internal quotation marks and citations omitted)); Fink v. Weill, No. 02 Civ.

10250, 2005 WL 2298224 (S.D.N.Y. Sep. 19, 2005) (applying Rales test where plaintiff accused

directors of failure to act).

As noted above, the Board consisted of fifteen members, three of whom were

Citigroup employees, at the time that the Complaint was filed.  Thus, the Court reviews the

Complaint to determine whether the factual allegations are sufficiently particularized to create a reasonable doubt as to at least eight of those August 2008 Directors' disinterestedness or independence.

Directorial interest exists where a director will receive a personal financial benefit from a transaction that is not equally shared by the stockholders or the corporation. Rales, 634 A.2d at 933. It also exists where a corporate decision will potentially have a materially detrimental impact on a director, but not on the corporation or the stockholders. Id. In the face of such adverse personal consequences, the director cannot be expected to exercise independent business judgment. However, where a director's interest is based on his potential personal liability, the director can only be considered "interested" if the potential personal liability rises to "a substantial likelihood;" it is not sufficient that "a mere threat" of personal liability is alleged. Id. (citing Aronson, 473 A.2d at 815); see also Wood, 953 A.2d at 141 n. 11 ("In Aronson, this Court held that the mere threat of personal liability . . . is insufficient to challenge either the independence or disinterestedness of directors" and that a reasonable doubt that a majority of directors is incapable of considering demand should only be found where "a substantial likelihood of personal liability exists." (internal quotation marks omitted) (omission in the original)).

"Independence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences." Aronson, 473 A.2d at 816. "[A] plaintiff charging domination and control of one or more directors must allege particularized facts manifesting 'a direction of corporate conduct in such a way as to comport with the wishes or interests of the corporation (or persons) doing the controlling.'" Id., quoting Kaplan v. Centex Corp., 284 A.2d 119, 123 (Del. Ch. 1971); see also Rales, 634 A.2d at 936 ("To establish lack of independence, [plaintiff] must show that the directors are "beholden" to the [interested

directors] or so under their influence that their discretion would be sterilized.").

In light of the fact that Pandit, Bischoff and Rubin held Citigroup executive positions, and taking into account (without deciding the significance of) Plaintiff's allegations concerning the magnitude of Hernandez' stockholdings and Citigroup director compensation, the Court will focus its independence and disinterestedness analysis on Plaintiff's allegations concerning the remaining eleven August 2008 Directors.

Plaintiff argues primarily that demand is excused because the remaining eleven directors were "interested" based on a substantial likelihood of personal liability in connection with the subject matter of this lawsuit.  In that connection, Plaintiff points to the directors' positions on various Board committees, notes that these directors would have been required to decide to sue themselves and/or fellow directors and allies, notes that there is an "insured v. insured" exclusion in the Company's directors' and officers' liability insurance policies for the relevant period, and alleges that these directors failed to act in the face of "red flags."  The Complaint also includes allegations with respect to the these directors' compensation (ranging from $43,000 to $260,000 paid in fees, stock awards and other compensation during 2007), the lengthy service of two of the Board members, and conclusory allegations regarding one of the directors' control and domination of other directors.  None of these allegations raises a reasonable doubt as to the disinterestedness or independence of these directors.

### *Allegations Concerning Interest*

The Court turns first to Plaintiff's allegations that the directors were "interested" based on exposure to a substantial likelihood of personal liability.[5]

---

[5]     As explained below, none of Plaintiff's allegations concerning disabling director interest is sufficient, or sufficiently particularized, to excuse the demand

_____ _"Red Flags"_

Plaintiff argues that the August 2008 Directors face a substantial likelihood of personal liability for failures of directorial oversight, see In re Caremark Int'l Inc. Derivative Litig., 698 A.2d 959 (Del. Ch. 1996), such that the eleven remaining directors would be "interested" for the purposes of a demand futility analysis.  In Caremark, the court articulated the necessary conditions predicate for assessing directorial oversight liability.  See In re Caremark Int'l Inc. Derivative Litig., 698 A.2d 959 (Del. Ch. 1996); Stone v. Ritter, 911 A.2d 362, 370 (Del. 2006). Those conditions are that: "(a) the directors utterly failed to implement any reporting or information system or controls; or (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention."  Stone, 911 A.2d at 370 (emphasis in the original).  Imposition of liability on either basis requires a showing that the directors knew that they were not discharging their fiduciary obligations and were therefore acting in bad faith.  In re ITT Corp. Derivative Litigation, 588 F. Supp. 2d 502, 508 (S.D.N.Y. 2008) (citing Stone, 911 A.2d at 370; Desimone v. Barrows, 924 A.2d 908, 935 (Del. Ch. 2007).)  "A failure-of-oversight claim against a corporation's directors 'is possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment.'"  In re IAC/InterActiveCorp Securities Litigation, 478 F. Supp. 2d 574, 605 (S.D.N.Y. 2007), quoting Caremark, 698 A.2d at 967.  Thus, to excuse demand on this basis,

_____

requirement.  Plaintiff's effort to avoid the demand requirement by alleging interest on the basis of likely personal liability faces the additional substantial impediment created by the presence of an exculpatory provision in Citigroup's charter.  This provision exculpates Citigroup's directors from personal liability for breaches of their fiduciary duty of care.  (See Davidow Decl., Ex. F at p. 13.)  Plaintiff has failed to proffer sufficient particularized allegations of non-exculpated conduct – bad faith, intentional misconduct, disloyalty, etc. – to indicate substantial risk of director personal liability notwithstanding this exculpatory provision.

plaintiffs "face a formidable challenge: . . . they must allege particularized facts showing that a majority of the Directors face a 'substantial likelihood' of personal liability for knowingly not discharging their fiduciary duties through bad-faith failures of oversight – either the failure to implement any reporting or information system or controls, or the conscious failure to monitor or oversee the operations of such system or controls."  Id. at 508-509.

Plaintiff argues that the directors' failure to act in the face of certain "red flags" is indicative of a substantial likelihood of personal liability under Caremark.[6]  These alleged "red flags" include the 2007 credit tightening, the 2007 decision by the FASB that ARS could no longer be treated as "cash equivalents" on investor balance sheets, the 2007 selloff of ARS securities, serial failure of monthly auctions, the Company's abandonment of the ARS market in February 2008, class actions and SEC and state regulatory proceedings.  (See Pl's Opp. at 14, n. 9, summarizing Complaint's "red flags").

Recent decisions from this district and the Chancery Court of Delaware illustrate just how difficult it is for a plaintiff to plead facts excusing demand based on directors' failure to

---

[6]     See, e.g., In re Citigroup Inc. Shareholder Derivative Litigation, 964 A.2d 106, 123-24 (Del. Ch. 2009) (characterizing plaintiffs' theory of how the director defendants would face personal liability based on defendants' alleged failure to properly monitor Citigroup's business risk, specifically its exposure to the subprime mortgage market, as "a bit of a twist on the traditional Caremark claim"); see also In re Citigroup Inc. Shareholder Derivative Litigation, No. 07 Civ. 9841, 2009 WL 2610746, at * 5 (S.D.N.Y. Aug. 25, 2009) (finding plaintiffs' claim that the directors breached their fiduciary duties by "allowing" Citigroup to invest in subprime mortgages despite "red flags" akin to a Caremark failure-of-oversight claim); Louisiana Municipal Police Employees Retirement System v. Blankfein, No. 08 Civ. 7605, 2009 WL 1422868, at *4 (S.D.N.Y. May 19, 2009) ("Unlike the traditional Caremark claim in which liability arises from a failure to monitor or oversee appropriately employee misconduct or violations of law, the allegations in the Complaint attempt to base liability on a failure to monitor business-risk related to the ARS market." (internal citations omitted)).

respond to "red flags."  In <u>re Citigroup Inc. Shareholder Derivative Litigation</u>, 964 A.2d 106

(Del. Ch. 2009), the Chancery Court of Delaware held that plaintiffs' conclusory allegations that

defendants' failure to prevent large losses by Citigroup in the face of certain warning signs - "red

flags" - that could or should have put defendants on notice of the business risks related to

investments in subprime assets meant that defendants must have consciously ignored these warning

signs or knowingly failed to monitor the risk in accordance, insufficient to state a claim for a failure

of oversight giving rise to a substantial risk of personal liability.  <u>Id.</u> at 126-127.  The court held

that the fact "[t]hat the director defendants knew of signs of a deterioration in the subprime

mortgage market, or even signs suggesting that conditions could decline further, is not sufficient to

show that the directors were or should have been aware of any wrongdoing at the Company or were

consciously disregarding a duty somehow to prevent Citigroup from suffering losses."  <u>Id.</u> at 128.

In <u>Louisiana Municipal Police Employees Retirement System v. Blankfein</u>, No. 08

Civ. 7605, 2009 WL 1422868 (S.D.N.Y. May 19, 2009), plaintiffs argued that defendants had

overlooked several "red flags" concerning the potential for manipulation of the ARS market in the

face of a deteriorating market, including several of the "red flags" that Plaintiff has alleged the

eleven remaining directors overlooked in this action.[7]  <u>Id.</u> at *4.  The <u>Blankfein</u> plaintiffs argued

---

[7]     "Specifically, Plaintiff argues that the SEC's 2006 Proceeding, concerning
impropriety connected to the ARS market at Goldman Sachs, was a red flag that
should have alerted Defendants to potential improper conduct, such as the
underlying conduct in this action. Plaintiff further alleges that the tightening of the
credit market in 2007, the failure of auctions in 2007-2008, and the decision of the
Financial Accounting Standards Board to require that ARS be listed on investors'
balance sheets as 'short-term investments' rather than 'cash equivalents' were red
flags that should have put Defendants on notice that the market for these securities
was not as healthy and liquid as Goldman Sachs believed and represented it to be."
<u>Louisiana Municipal Police Employees Retirement System v. Blankfein</u>, No. 08 Civ.
7605, 2009 WL 1422868, at *4 (S.D.N.Y. May 19, 2009).

that the directors faced a substantial risk of personal liability based on their failure to respond

correctly to "red flag" signs that the ARS market was not as healthy and liquid as some employees

believed it to be or represented it to be.  The court held that the "red flags" in question were nothing

more than signs of continuing deterioration in the financial markets and, thus, insufficient bases for

for a claim for relief under Caremark.  Id. at *5.  In re Citigroup Inc. Shareholder Derivative

Litigation, No. 07 Civ. 9841, 2009 WL 2610746 (S.D.N.Y. Aug. 25, 2009), which also involved

allegations of officer and director wrongdoing in connection with the subprime mortgage market,

plaintiffs alleged that the board acted in bad faith because, although the board had a system for

monitoring business risk in place in the form of its "Audit and Risk Management Committee," the

board members ignored "red flags" that should have alerted them to the impending downturn in the

housing market and Citigroup's potential losses.  Id. at *1-2, 6.  In rejecting plaintiffs' argument,

the court noted that "neither [the 'red flags'] nor any other part of the complaint specifies 'how the

board's oversight mechanisms were inadequate or how the director defendants knew of these

inadequacies and consciously ignored them.'" Id. at *6, quoting In re Citigroup Inc. Shareholder

Derivative Litigation, 964 A.2d 106, 128 (Del. Ch. 2009).

            Here, Plaintiff has not alleged a complete failure to implement any reporting or

information system.  In fact, as in In re Citigroup Inc. Shareholder Derivative Litigation, No. 07

Civ. 9841, 2009 WL 2610746 (S.D.N.Y. Aug. 25, 2009) case, Plaintiff has alleged the existence of

an Audit and Risk Management Committee.  Instead, Plaintiff bases his Caremark claim on the

failure to respond in the face of "red flags."  The Court finds that these alleged "red flags," some of

which are the same "red flags" alleged in the aforementioned cases, were nothing more than signs

of a continued deterioration in the financial markets and are insufficient to frame a substantial

likelihood of liability in connection with a Caremark claim.  Plaintiff has not alleged specific facts

regarding the inadequacies of the Company's oversight mechanisms or alleged how any of the eleven directors knew of the inadequacies.  Furthermore, even if Plaintiff had adequately alleged "red flags," Plaintiff has failed to proffer specific factual allegations regarding the individual directors' conduct in response to these alleged "red flags."  In re ITT Corp. Derivative Litigation, 588 F. Supp. 2d 502, 513 (S.D.N.Y. 2008) (Even if the "red flags" were sufficient to put Defendants on notice as to possible misconduct "without any information regarding the individual Directors' responses, if any, to those events, the Court cannot say whether the Directors failed to act or if the actions they took were inappropriate in light of the information they received.").  Plaintiff's allegations are, furthermore, entirely devoid of particulars indicative of bad faith in connection with the allegedly improper inaction.  Cf. In re Citigroup Inc. Shareholder Derivative Litigation, 964 A.2d at 128.  Thus, the Court finds that Plaintiff has failed to meet the high pleading standard required to establish demand futility derived from "interest" on the party of any of the eleven remaining August 2008 Directors on the basis of a substantial likelihood of personal liability under Caremark.

### Forced to Sue Themselves/"Insured vs. Insured" Exception

Plaintiff also argues that demand on the Board would be futile because the eleven directors would have been forced to sue themselves, their fellow directors and their allies in the top ranks of the Company, in order to bring this suit.  This argument is unavailing.

As the Aronson court recognized, this "bootstrap" argument that demand is excused because defendants would have to sue themselves "thereby placing the conduct of the litigation in hostile hands and preventing its effective prosecution" has long been made to and dismissed by courts.  Aronson, 473 A.2d at 818; see also Ferre v. McGrath. No. 06 Civ. 1684, 2007 WL 1180650, at *7 (S.D.N.Y. Feb. 16, 2007) ("The rote allegation that directors would have to sue

themselves has been consistently rejected as a basis for excusing demand.").  To excuse plaintiffs

from the demand requirement whenever directors were named as defendants would be to entirely

abrogate Rule 23.1.  Thus, "[u]nless facts are alleged with particularity to overcome the

presumptions of independence and a proper exercise of business judgment, in which case the

directors could not be expected to sue themselves, a bare claim of this sort raises no legally

cognizable issue under Delaware corporate law."  Id. at 818; see also Pogostin v. Rice, 480 A.2d

619, 624 (Del. 1984) ("[W]e note that the plaintiffs' bootstrap allegations of futility, based on

claims of directorial participation in and liability for the wrongs alleged, coupled with a reluctance

by directors to sue themselves, were laid to rest in Aronson."), overruled on other grounds by

Brehm v. Eisner, 746 A.2d 244 (Del. 2000).

Similarly, the existence of an "insured vs. insured" exclusion in the Company's

directors' and officers' liability insurance policies such that the August 2008 Directors would not

be insured for the liability asserted does not establish a substantial likelihood of personal liability

that would prevent directors from exercising independent business judgment.  "Indeed, this

argument has been rejected repeatedly under Delaware law."  Ferre, 2007 WL 11180650, at *8; see

also Kernaghan, 2008 WL 4450268, at *7 ("Plaintiff's allegation that the Defendants' directors'

and officers' liability insurance policies have an 'insured v. insured' exclusion that precludes coverage

for derivative suits filed against them [is] also insufficient to create a reasonable doubt as to

disinterestedness."); Halpert Enterprises, Inc. v. Harrison, 362 F. Supp. 2d 426, 433 (S.D.N.Y.

2005) ("That the insurance policy indemnifying defendants would not cover their liability were the

corporation itself to bring suit against them is also not a sufficiently particular basis for inferring

demand futility."); Decker v. Clausen, Civ. A. Nos. 10,684, 10,685, 1989 WL 133617, at *2 (Del.

Ch. Nov. 6, 1989) (the insured vs. insured exclusion argument merely a "variation[ ] on the

'directors suing themselves' . . . refrain").

*Committee Positions*

Plaintiff's allegations regarding the multiple committee memberships and committee positions of the eleven remaining directors also fail to create a reasonable doubt as to the disinterestedness on the part of these directors.  Insofar as Plaintiff is alleging that these directors faced a substantial likelihood of personal liability based on their various Board committee memberships and positions, their allegations are insufficiently particularized.  Board committee membership, without more, cannot establish demand futility.  See, e.g., Pirelli Armstrong Tire Corp. Retiree Medical Benefits Trust v. Lundgren, 579 F. Supp. 2d 520, 532 (S.D.N.Y. 2008) (general allegations that "the members of the Audit Committee were responsible for 'reviewing and discussing . . . the Company's earnings press releases, . . . financial information and earnings guidance . . . and . . . disclosure and internal controls,' and 'participated in the wrongdoing' by preparing and/or failing to correct the allegedly false statements at issue" were insufficient as a matter of law); Kernaghan, 2008 WL 4450268, at * 8 ("Plaintiff's repeated allegations that the director-Defendants, by virtue of their positions on the Board and/or the Audit Committee, knew or should have known of the material non-public information are also insufficient to meet the level of particularity required to demonstrate demand futility."); see also In re Citigroup Inc. Shareholder Derivative Litigation, 964 A.2d 106, 135 (Del. Ch. 2009) ("Although the members of the ARM Committee were charged with reviewing and ensuring the accuracy of Citigroup's financial statements under the ARM Committee charter, director liability is not measured by the aspirational standard established by the internal documents detailing a company's oversight system.") Plaintiff's lengthy recitation of the duties and responsibilities enumerated in those committees' charters does not supply the requisite particularity.  See Blankfein, 2009 WL 1422868, at *7 ("The

Complaint's lengthy recitation of various Board committee governance principles merely shows that there exists a body of rules which may have been violated (internal quotation marks and citation omitted)); see also Pirelli Armstrong Tire Corp. Retiree Medical Benefits Trust v. Lundgren, 579 F. Supp.2d 520, 532-33 (S.D.N.Y. 2008) (not sufficient that the complaint contained some detail regarding the alleged responsibilities of the Audit Committee).

*Compensation*

Plaintiff also asserts that demand is futile because the eleven directors would not take any action against themselves or fellow directors that would put their compensation in jeopardy.  This argument fails as well.  "It is well established that allegations that defendants 'are paid for their services as directors' do not excuse demand."  Blankfein, 2009 WL 1422868, at *8, quoting Grobow, 539 A.2d at 188; see also In re IAC/InterActiveCorp Securities Litigation, 478 F. Supp. 2d 574, 602 (S.D.N.Y. 2007) ("Furthermore, the receipt of directors' fees does not constitute a disqualifying interest for the purposes of the demand requirement." (internal quotation marks omitted)); Fink v. Komansky, No. 03 Civ. 0388, 2004 WL 2813166, at * 7 (S.D.N.Y. Dec. 8, 2004) ("Without specific facts suggesting a lack of independence by the Board, receipt by directors of benefits and compensation as a result of Board membership is insufficient to excuse demand.  To rule otherwise would only circumvent the purpose of the demand requirement and render Rule 23.1 useless." (internal citations omitted)); A.R. DeMarco Enterprises, Inc. v. Ocean Spray Cranberries, Inc., No.  Civ. A. 19133, 2002 WL 31820970, at *5 (Del. Ch. 2002) ("It is well established in Delaware law that ordinary director compensation alone is not enough to show demand futility.").

Plaintiff does not allege that the compensation that these eleven directors received was anything other than customary director compensation.  See Orman v. Cullman, 794 A.2d 5, 29, fn. 62 (Del. Ch. 2002) (noting that those cases holding that directors' fees did not constitute a

financial interest "were based on circumstances in which the fees paid to directors were customary and usual in amount.  [And] . . . the disqualifying effect of such fees might be different if the fees were shown to exceed materially what is commonly understood and accepted to be a usual and customary director's fee."); see also Halpert Enterprises, 362 F. Supp. 2d at 433 ("The allegations that the Board members receive various fees from [the company] are similarly unavailing, because there are no particularized allegations indicating that that compensation is excessive.").  Thus, Plaintiff's allegations regarding director compensation do not raise any doubt, let alone reasonable doubt, as to directorial disinterestedness.[8]

> *Allegations Concerning Independence*

The Court now turns to Plaintiff's contention that the eleven directors under consideration are not independent within the meaning of the demand futility analysis and, thus, that demand must be excused as futile.

*Length of Service*

Plaintiff alleges that two of the eleven directors have sat on the Board for a combined 57 years.  (Compl. ¶ 55.)  According to Plaintiff, these directors cannot be expected to

---

[8]   The Complaint also alleges that five of these directors benefitted from the full Board's decision to accelerate the vesting of stock options held by those five defendants in order to avoid recognizing the related expenses.  (Compl. at ¶ 55(e).) However, the Complaint includes no particularized allegation that the options exceeded common director awards or were in any other way improper.  Compare In re eBay Shareholders Litig., No. Civ. A. 19988, 2004 WL 253521, at * 3 (Del. Ch. Feb.11, 2004) (stating, in holding demand futile where four non-defendant directors whose unvested options would vest and new options be received only if they retained their positions as directors, "[g]iven that the value of the options . . . potentially run[s] into the millions of dollars, one cannot conclude realistically that [a non-defendant director] would be able to objectively and impartially consider a demand to bring litigation against those to whom he is beholden for his current position and future.").

exercise their independent business judgment because "[t]hey have served so long that they clearly identify with the Board and their fellow officers." (<u>Id.</u>)  Plaintiff also alleges that a newly-appointed member of the Board cannot exercise independent and disinterested business judgment because he is such a recent member of the Board.  (<u>Id.</u> at ¶ 135(h).)  Despite Plaintiff's creative argument that one can both be on a board for too long and too short a period to exercise independent business judgment, its arguments fail.  "It is well established under Delaware law that the number of years that defendants have served on a board . . . cannot suffice as a basis to successfully plead a lack of independence for demand futility purposes."  <u>In re Pfizer, Inc. Derivative Securities Litigation</u>, 307 Fed. Appx. 595 (2d Cir. 2009).

*Bischoff's Domination and Control*

General and conclusory allegations regarding Bischoff's ability to dominate and control the Board based on his long period of service in high-level positions, and that he "controls the compensation and other benefits paid to the other directors, what committees they sit on, what role they will play in governance, and other processes" are insufficient to raise a reasonable doubt as to the independence of the remaining eleven directors.   These conclusory allegations of control do not meet Plaintiff's burden of alleging "particularized facts manifesting a direction of corporate conduct in such a way as to comport with the wishes or interests of the corporation (or persons) doing the controlling."  <u>Aronson</u>, 473 A.2d at 816.  Plaintiff's "shorthand shibboleth of 'dominated and controlled directors' is insufficient," <u>id.</u>, and the deficiency is not cured by Plaintiff's additional conclusory allegations regarding compensation, committee membership and governance.  <u>See also</u>, <u>e.g.</u>, <u>Highland Legacy Ltd. v. Singer</u>, No. Civ. A. 1566, 2006 WL 741939, at * 5 (Del. Ch. Mar. 17, 2006) (demand was not futile where plaintiff failed to allege that directors were dependent on non-independent director for their director positions and plaintiff failed to allege particularized facts that

non-independent director had the ability to deprive other directors of their director fees).

### Compensation/Committee Positions

Nor do any of the other grounds raised in connection with Plaintiff's contention of directorial interest raise a reasonable doubt as to the independence of the eleven directors being considered.  Insofar as Plaintiff alleges that these directors' compensation precluded them from exercising independent business judgment, as the Court has explained earlier, normal director compensation is not a basis for excusing demand.  Grobow, 539 A.2d at188.  To hold otherwise would be to eviscerate the demand requirement.  Similarly, Plaintiff's general allegations regarding the defendants' positions on various Board committees also fail to raise a reasonable doubt as to their independence.  See Blankfein, 2009 WL 1422868, at *7 (rejecting plaintiff's argument regarding alleged lack of independence based on defendants' membership in all three of the company's board committees, including the oversight and compensation committee); see also In re Morgan Stanley & Co., Inc., No. 08 Civ. 7587, 2009 WL 2195928 (S.D.N.Y. July 22, 2009) (rejecting the argument "that service on an audit committee, even one charged with reviewing the risks of market-making with auction-rate securities, should corrupt independence.").

Plaintiff has failed to proffer particularized allegations sufficient to raise a reasonable doubt as to the disinterestedness or independence of any of the eleven remaining directors and thus has failed to show that a demand on the Board prior to bringing this action would have been futile and, thus, should be excused.

### CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss Plaintiff's Complaint for failure to make a demand on the Board is granted.  Plaintiff may file and serve an amended complaint by October 1, 2009, with a courtesy copy provided Chambers.  Failure to file and serve a

timely amended pleading will result in the entry of judgment, without further advance notice to

Plaintiff, dismissing the complaint for failure to meet the demand requirement. This Opinion and

Order resolves Docket Entry No. 9.

     SO ORDERED.


Dated: New York, New York
     September 10, 2009

 

LAURA TAYLOR SWAIN
United States District Judge